CHARLES BJORNQUIST *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Suffolk.    January 20, 1904. — February 25, 1904.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & BRALEY, JJ.

*Negligence*, Liability to trespasser.    *Railroad.*

In an action against a railroad company by a boy about eight and a quarter years old, when injured, for injuries caused by jumping off a car of the defendant when ordered to do so by a person described as a brakeman, it appeared, that the plaintiff and another boy three years older were stealing a ride for amusement, and that the plaintiff was lying on his stomach on the edge of one of three oil tank platform cars, which were in a freight yard, moving very slowly without an engine, when the defendant's servant in charge of the cars, walking toward the plaintiff but not being near him, said "Get off there or I will break your neck", and the plaintiff thereupon put his foot in a step fastened to the car and was going to jump, when he slipped and fell under the wheels, receiving the injuries. *Held*, that there was no evidence to go to the jury of such a wilful and wanton disregard of human life and personal safety on the part of the defendant's servant as would make the defendant liable to the plaintiff, who was a trespasser, and that a verdict for the plaintiff was not justified.

TORT, by a boy eight years three and one half months old, when injured, for injuries from jumping off a freight car when ordered to do so by a servant of the defendant. Writ dated January 22, 1900.

In the Superior Court the case was tried before *Harris*, J. The judge refused to order a verdict for the defendant, and submitted the case to the jury, framing also four questions, which, with the answers given by the jury, were as follows:

"1. Was the plaintiff, at the time the brakeman spoke to and moved towards him, in a position of safety?"  "He was."

"2. Was the car, at the time that the brakeman spoke to the

plaintiff, moving at such a rate of speed as to make it dangerous for the plaintiff to get off?"   "It was moving at a dangerous rate of speed for the plaintiff."

"3. Did the plaintiff use due care in attempting to get off the car in obedience to the command of the brakeman?"   "He did use all the care he was capable of at the time."

"4. Did the plaintiff attempt to leave the car because of fear of injury from the brakeman, or because he knew he was a trespasser and wanted to escape the consequences of his own act of trespass?"   "He left on account of fear of injury from the brakeman."

The jury returned a verdict for the plaintiff in the sum of $21,000; and the defendant alleged exceptions.

*S. Hoar*, (*G. P. Furber* with him,) for the defendant.

*S. A. Fuller*, (*W. E. Bowden* with him,) for the plaintiff.

KNOWLTON, C. J.   The defendant was moving two or three oil tank cars on a short side track used for loading and unloading freight, close by its freight yard in Cambridge.   The switching engine was behind the cars without being coupled to them, and the cars were pushed or "kicked" a short distance on the tracks, and left to stop from their own inertia.   These were platform cars, constructed with a large tank extending longitudinally between points about two feet from the ends of the car, and with stakes set at intervals along the sides of the car at the edge of the floor, with an iron rod passing through the top of the stakes, leaving room to pass between the tank and the rod on each side.   The plaintiff, a boy of ordinary intelligence, about eight and a quarter years of age at the time of the accident, was a trespasser on the forward one of these cars, lying on his stomach with his feet and legs hanging over the side of the car. At that point there was an iron step on the side of the car, and he had climbed up, taking hold of the stake, and was riding as the car was pushed by the engine.   The floor of the car was about as high from the ground as his shoulders when he was standing, or as he testified, about as high as the crutch which he used at the time of the trial.   One Perry, a companion, three years older than he, had got up on the opposite side of the car with his feet on the step, which was an iron strap or loop attached underneath to the side of the car, and was riding,

holding on to the upright stake which was near the end of the car. One of the defendant's servants, who is described as a brakeman, had uncoupled the engine from the car next it, and was-riding on the car, when he saw one or both of these boys near the forward end of the forward car, and called out in a loud tone, " Get off there or I will break your neck." The boys immediately started to jump off, and the plaintiff fell so that his feet came upon the track and he was seriously injured. His language in testifying was, " When I was going to jump I slipped. . . . There was a step right there ; I put my foot in that and I was going to jump and I slipped and went under the wheels."

The defendant's servant was acting in the management of the cars just before the accident, and it does not appear that any other person was employed at that time in the control of them. On this evidence the jury might well find that it was within the scope of his employment to try to keep trespassers away from them. To the plaintiff as a trespasser the defendant owed no duty, except to refrain from wilfully or wantonly and recklessly exposing him to danger. This is the uniformly recognized rule in regard to the management of a proprietor's business and the performance of his ordinary duties. A question may be raised whether the rule is the same if the proprietor does anything which is directed to the trespasser and is intended to affect immediately his conduct or condition. We are of opinion that in ordinary cases this makes no difference, if the action is in the exercise of the legal rights of the proprietor, and in other respects is in the proper performance of his duties. When this action takes the form of the intentional use of force upon the person of a trespasser, the force must be limited to that which is reasonable under the circumstances, in the exercise of his legal rights. Any excess may be punished as an assault and battery. This is because force upon the person of another is ordinarily harmful and injurious. One who uses it must guard his conduct so as not to go beyond his legal rights. So, if an action is brought for reckless and wanton negligence in dealing with a trespasser, and if the conduct relied on is the intentional use of force upon the person in an attempt to exercise one's legal rights, it may well be that because of the

injurious nature of the agency employed, wantonness and reck-lessness would ordinarily be inferred from any excess of inten-tional force beyond that which was reasonably necessary. But this principle is not applicable to a use of language which is intended to have no further effect than to influence the volun-tary action of another. In the latter case the question is not whether the use of the language is entirely reasonable and proper, but whether it is so unreasonable or improper in refer-ence to its probable effect upon the safety of the person to whom it is addressed, as to indicate a wanton and reckless dis-regard of probable dangerous consequences.

In the present case all that the brakeman did which is relied on as reckless and wanton negligence, was to call out as above stated, and to walk forward in an ordinary way. According to the testimony of two of the plaintiff's witnesses, he was not on the car on which the plaintiff was, but on the one behind it. According to the testimony of the plaintiff he was at the rear end of the car on which the plaintiff was, and from there was walking forward.

If we assume that he was in charge of the cars, it was his duty to do all that he reasonably could to keep trespassers away from them. It was his duty, not only in reference to the inter-ests of his employer, but in reference to the interests of the trespassers themselves. The dangers to trespassers about mov-ing cars, especially in freight yards, are great and constant. The persons with whom the employee has to deal, whether vagrants trying to steal rides upon freight trains or boys seeking amusement upon moving cars in freight yards, are almost always of a bold and lawless kind. Sober reasoning, friendly advice and gentle admonition, after the intruders have accomplished their purpose, would in most cases be entirely ineffectual to pre-vent or diminish trespassing by such persons. From the neces-sity of the case, appeal must be made in some form and to some degree to fear as a motive to induce obedience to proper rules. It is necessary and proper, in a reasonable way, to interfere with the enjoyment of boys taking rides in such places, rather than to permit them to complete their rides pleasantly.

The evidence is that the plaintiff lived only three hundred or four hundred yards from the place of the accident, and that

between his home and the railroad were open fields where the boys were accustomed to play ball and other games.  He testified that just before the accident he was returning from fishing, and had stopped with two other boys to play tag on the platform of one of the buildings of the oil works at which cars were unloaded, and that as he saw the two tank cars and the engine he called to Perry, his companion, " Come on, let's take a ride," and that they then ran and got upon the car furthest from the engine.  It is hardly to be supposed that boys living so near and accustomed to play close by moving cars, were ignorant of orders of their parents or others which forbade them to get upon the freight cars which were being switched back and forth in or near the yard.  It is reasonable to infer that in dealing with such boys, quite as much for their own safety as for the interests of the railroad company, some show of severity would be needed on the part of the defendant's employees.  These conditions are important in considering the conduct of the defendant's servant.

He gave a single command, accompanied with a threat, which no intelligent boy would interpret literally, but which implied a severe reproof, and a possibility of punishment if disobedience was repeated and persisted in.  Except the use of this expression, which apparently was instantaneous and perhaps almost involuntary, there was nothing said or done by him to which exception could be taken.  Is this evidence of a wanton and reckless disregard for the personal safety of the boys?

The conduct which creates a liability to a trespasser in cases of this kind has been referred to in the books in a variety of ways.  Sometimes it has been called gross negligence and sometimes wilful negligence.  Plainly it is something more than is necessary to constitute the gross negligence referred to in our statutes and in decisions of this court.  The term " wilful negligence " is not a strictly accurate description of the wrong.  But wanton and reckless negligence in this class of cases includes something more than ordinary inadvertence.  In its essence it is like a wilful, intentional wrong.  It is illustrated by an act which otherwise might be unobjectionable, but which is liable or likely to do great harm, and which is done in a wanton and reckless disregard of the probable injurious consequences.  This is a wrong of a much more heinous character than common

inadvertence.    See *Aiken* v. *Holyoke Street Railway*, 184 Mass. 269, and cases there cited.

In the present case there is no evidence to show when the brakeman first saw either of the boys, or whether he had seen more than one of them before he spoke.    His language seems to refer to but one person.    It is at least as probable that he was speaking to the larger boy, Perry, who was standing on the step on the right hand side of the car, as to the plaintiff. Perry's position was far more prominent than that of the plaintiff who was lying on the floor of the car.    The fact that the brakeman subsequently walked forward on the side where the plaintiff was, is not significant, for upon all the testimony there was then nothing threatening in his attitude or manner.    When he spoke the cars must have been going very slowly, for the testimony of both of the boys is that they started to jump off as soon as he spoke, and the cars moved only about fifty feet after the plaintiff fell.    There was no evidence that the brakes were set at any time.    Moreover, Perry testified that when he jumped off he passed around in front of the car and went away.    If the cars, stopping of their own inertia, moved only fifty feet after the accident, they had then come almost to a state of rest.

The question relates to the state of mind of the brakeman, which can be inferred only from the circumstances.    If his language was addressed to the plaintiff, was there, from his point of view, such a probability that he would jump off before the car stopped, as to involve any danger of falling?    If the plaintiff should start to jump off before the car stopped, was there such a probability that he would get under the wheels as to indicate wantonness and recklessness on the part of the brakeman? There was a stake and a strap or loop step attached to the side of the car just where the plaintiff was; besides, the side of the car projected out beyond the track, and if the plaintiff fell perpendicularly he would not be likely to fall upon the track. The brakeman had no reason to think that a boy riding upon a car in that way would fail to use such care as he was capable of in getting off, whether he started before the car stopped or afterwards.    The undisputed evidence shows that the plaintiff was not acting involuntarily, but was trying to jump from the step when his foot slipped.

The right of a brakeman upon a train to perform his prescribed duties, even though performance involves something of peril to a trespasser, is stated in *Leonard* v. *Boston & Albany Railroad*, 170 Mass. 318. In *Planz* v. *Boston & Albany Railroad*, 157 Mass. 377, where the trespasser was injured in jumping from a moving freight train at the command of a brakeman, it was held that there could be no recovery. *Mugford* v. *Boston & Maine Railroad*, 173 Mass. 10, is very similar to the present case, and it was held that there was no evidence of negligence on the part of the defendant's servant. In that case the plaintiff was a boy a little older than the present plaintiff, but the cars seem to have been running considerably faster than these. See also *Bolin* v. *Chicago, St. Paul, Minneapolis & Omaha Railway*, 108 Wis. 333. In view of the duties which the defendant's servant had to perform, and the circumstances attending the accident, we discover no evidence that when he gave his command there was such an apparent probability that it would cause serious injury to the plaintiff as to indicate a wanton and reckless disregard for harmful consequences.

If he had owed the plaintiff a duty to make provision for his safety, or to refrain from action which might in any degree expose him to danger, the case would be very different. If the question were whether he exercised such care for the plaintiff's safety as would be deemed reasonable for one charged with a positive duty to look out for him and protect him, it might well be submitted to the jury. If the brakeman's command was given to the plaintiff, as distinguished from the larger boy in a different situation, it might well be found that he did not exercise a high degree of care for the plaintiff's safety. But such an omission falls short of recklessness which is equivalent to a wilful wrong for which he would have been subject to criminal punishment if the accident had caused the plaintiff's death.

The burden of proof was upon the plaintiff to show this grave misconduct of the defendant's servant. While we feel that the case is not free from difficulty, we are of opinion that there was no evidence which tends to show that he was guilty of a wanton and reckless disregard for human life and personal safety.

*Exceptions sustained.*