WINSLOW WARREN & others, trustees, *vs.* ELIZABETH B.
PAZOLT & others.

SAME *vs.* MARY F. RHODES.

Suffolk. January 27, 28 ; October 15, 1909. — October 20, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Trust,* Accounting by trustee, Powers of trustee, Compensation of trustee. *Waiver.*
*Probate Court,* Jurisdiction, Notice to parties. *Election. Notice. Infant.*
*Guardian ad Litem. Words,* "Wilful neglect or default."

On an appeal from a decree of the Probate Court confirming a finding in a report
of an auditor, to whom had been referred accounts of trustees under a will
covering a period of five years, to the effect that one, who was entitled to a
certain share of the income of the trust estate during his life and who was
objecting to a certain conveyance by the trustees to one of their own number
made five years before the period covered by the earliest account, and to
a consequent diminution of, income as shown by the accounts in question,
at the time of the conveyance had full knowledge of the transaction, a
single justice of this court, after an extended hearing, stated that he was
unable to find in the evidence that the finding of the auditor had been con-
trolled, and this court, for whose determination the case was reserved by the
single justice with a report by a commissioner of all the evidence, ruled that
the objecting life beneficiary not only had full knowledge of the transaction, but
also had acquiesced in it, and therefore *held,* that such life beneficiary had waived
his right to object.

At hearings on accounts filed by trustees under a certain will for a period of five
years, before an auditor appointed by the Probate Court, before a judge of the
Probate Court after the filing of the auditor's report and before a single justice
of this court on an appeal from a decree of the Probate Court confirming the
auditor's report, persons interested in the estate after the death of certain life
beneficiaries objected to a certain sale and transfer, made by the trustees
five years before the earliest of the accounts, of a part of the trust estate to
one of their own number and requested that such part of the estate be recon-
veyed to the trustees. After the accounts had been referred to the auditor, the
objecting beneficiaries brought a bill in equity in the Circuit Court of the
United States seeking such reconveyance, and, after the filing of the auditor's
report but before the decree of the Probate Court, brought a bill in equity for
the same purpose in the Superior Court of this Commonwealth. *Held,* that the
question, whether or not the objecting beneficiaries should be put to their
election between the proceedings in the Probate Court and the suits in equity
brought by them, was for the determination of the courts where those suits
were pending; that, having raised and prosecuted their objections in the pro-
ceedings in the Probate Court, they could not withdraw therefrom, but must

submit to a determination of the question whether the trustee who had purchased and had received from his co-trustees the conveyance of a part of the trust property should account in whole or in part for the property thus received by him.

On a reservation by a single justice of this court for determination by the full court of the question whether a decree of the Probate Court allowing certain accounts of trustees under a will was right, the record included the report of an auditor to whom the accounts were referred in the Probate Court, all the testimony and evidence given before the single justice and a memorandum of findings by the single justice. One matter in issue was whether one of the trustees should be held to account for an interest in real estate of the trust sold and through a third party conveyed to him by the trustees. The evidence was held by this court to show as to the real estate in question that the trustees, being desirous of buying it, found that, if they took title to themselves only, they would have to take it subject to a mortgage of $115,000, which was too large a mortgage for the trust estate wisely to carry, that it therefore was contemplated that one of the trustees should sell some property which he individually owned and from the proceeds thereof should purchase a portion of the estate which the trustees contemplated buying, and that with the money thus realized the trustees should reduce the mortgage ; that the sale of the trustee's individual property was delayed and, in the meantime, the trustees, without agreeing definitely to convey any of the property to one of their number and without having determined upon what portion thereof they desired so to convey, purchased the real estate subject to the mortgage of $115,000; that thereafter, the trustee having sold his individual property, the trustees sold to him for an adequate price one third of the real estate they had purchased and used the money they received from him to reduce the mortgage, he assuming one third of the mortgage obligation ; that the trustees all acted in good faith and that under the circumstances it was proper for them not to desire any one except one of their own number to be a co-owner with them of the property in question. *Held,* that the sale and conveyance to one of the trustees of the one third interest could not be avoided.

A trustee under a Massachusetts trust is justified in tearing down an old building owned by the trust and in erecting a new one in its place when a prudent business man would do so to secure a fair return by way of income and at the same time to maintain the corpus of the portion of the principal so invested intact, having regard to the relation which such an investment, when made, would have to the amount of the principal of the trust fund as a whole.

An application to the Probate Court under R. L. c. 147, § 18, by a trustee under a will for leave to mortgage real estate belonging to the trust for the purpose of erecting, altering, completing, repairing or improving a building on such estate, is in the nature of a proceeding *in rem* for the conservation of the trust estate as a whole, and in such a case personal service on those interested in the estate is not necessary, but reasonable notice only need be given; nor is the appointment of a guardian *ad litem* for minors interested in the estate necessary in the absence of a legislative requirement.

The entire amount of a trust under a Massachusetts will amounted to $920,000, and one item was a piece of real estate on Tremont Street in Boston worth $375,000. The trustees, of whom there were three, purchased adjoining property for $28,000, purchased the rights of lessees in possession of the premises under written leases for $13,750, with leave of the Probate Court obtained $450,000 by mortgaging trust property, tore down old buildings on the property and

erected a large office building in their stead. The will gave the trustees power, "in case any of said trustees shall see fit, to sell or dispose of or change the investment of any of the property at any time held by them in trust," and provided that the trustees "shall each be liable only for his own receipts, payments, and wilful defaults in the premises . . . nor be answerable for any loss or damage which may happen to the trust property without their respective wilful neglect or default." *Held*, that, while the acts of the trustees with regard to the erection of the building could not be justified as done in the exercise of a sound discretion, the trustees were not chargeable for the investment, since, in acting as they did, they were not guilty of "wilful neglect or default."

The term "wilful default," occurring in a will providing that trustees should not "be answerable for any loss or damage which may happen to the trust property without their respective wilful neglect or default," means intentionally making away with the trust property, and "wilful neglect" means such reckless indifference to the true interests of the trust as to amount to or partake of the nature of a wilful violation of duty.

Trustees under a will, who are to pay the income of the trust property to certain persons during their lives, and, as they die, divide the principal from time to time among their descendants, and who by the provisions of the will are given power, if any of them should "see fit, to sell or dispose of or change the investment of any of the property at any time held by them in trust," have not power to borrow money to add to the amount of the investments of the trust, without first obtaining leave from the Probate Court.

The trustees under a will, whose provisions did not specifically give them power to borrow money for the purposes of the trust, were to pay the income from the trust property to certain persons during their lives and, as they died, to divide the property among their descendants. One of the life beneficiaries dying and a partial distribution of the trust property occurring, the trustees gave to two of those entitled to share in the distribution trustees' notes bearing interest at four per cent for a part of their share, and thereafter paid interest on such notes from trust funds. *Held*, that the shares should have been paid outright when due, and that the trustees therefore were chargeable in their accounts with all amounts paid on the notes by way of principal and interest.

It is proper for trustees under a will, by whose provisions they are not specifically given power to borrow money for the purposes of the trust, to pay interest on temporary loans, which were made on the security of bonds and other securities and which were to be paid out of the proceeds of the sale of the bonds and securities, the loans being procured to get money that was needed immediately and at a time when a sale of the bonds and securities would be disadvantageous.

In a will creating a trust, it was provided that the trustees "shall each be liable only for his own receipts, payments, and wilful defaults in the premises . . . nor be answerable for any loss or damage which may happen to the trust property without their wilful neglect or default." The trustees made an investment of trust funds, which this court held was unauthorized but in the making of which the trustees were not guilty of wilful neglect or default. In their accounts the trustees sought to be credited with certain items as commissions on sums paid out in the investment and also with an item of extra compensation for services in the matter, and at a hearing on the accounts did not elect to take over the unauthorized investment and make its amount good to the trust, but availed themselves of the defense that there had been no wilful neglect or default on their part. *Held*, that the items for commission and compensation should be disallowed.

Loring, J.　These are two appeals from a decree of the Probate Court allowing amended accounts filed by the trustees under the will of Andrew Carney.

Andrew Carney died on April 3, 1864.　By his last will and codicil he gave property, then appraised at $387,892.21, in trust * for his adopted daughter, Mrs. Reggio, and her three children, Josephine Elizabeth, afterwards Mrs. Pazolt, Mary Frances, afterwards Mrs. Rhodes, and Andrew Carney Reggio, each to have one quarter for life with remainders to their respective children, the issue of deceased children taking by right of representation.

There was a provision in the will that Andrew should have in fee one half of the one quarter given him for life, if he should so request in writing after he became of age.　He made the

---

* Material portions of the will, other than those summarized in the opinion, were as follows:

"Article Twenty-first.　It is my will that the trustees herein appointed shall each be liable only for his own receipts, payments, and wilful defaults in the premises, and not for the receipts, payments, or defaults of any other trustee or trustees, nor be answerable for any loss or damage which may happen to the trust property without their respective wilful neglect or default. . . .

"Article Twenty-fifth.　And it is also my will that in case any of said trustees shall see fit to sell or dispose of or change the investment of any of the property at any time held by him or them in trust under the provisions of this my will, such trustee or trustees may make such change, and may sell at public auction or private sale to such person or persons, for such considerations, upon such terms and conditions as such trustee or trustees shall see fit, any of the property at any time so held in trust by such trustee or trustees, or any part thereof, and may convey the property so sold by good and sufficient conveyances, in fee simple or otherwise, and by suitable transfers to the purchaser or purchasers, and shall collect and receive the proceeds of such sale or sales, and after deducting therefrom the expenses attending the said sales and conveyances, shall invest the remainder thereof in such real estate, real estate mortgages, State, city, or bank stocks, or other property or securities as such trustee or trustees may deem best, and take conveyances of the property in which the same shall be invested, to such trustee or trustees, to be held upon the same trusts, to the same uses, for the same purposes, and with the same powers as the property so sold was held under this will, or otherwise dispose of such remainder, or any part thereof, according to the provisions of this my will; and the property so sold and conveyed shall thenceforth remain discharged of all trusts declared by this will, and the purchaser or purchasers thereof shall not be required to see to the application of the purchase money."

request, and one half of that one quarter was conveyed and transferred to him in 1888. Thereafter, until the death of Mrs. Pazolt on June 9, 1899, the trust property was held as follows: Two sevenths for Mrs. Reggio, two sevenths for Mrs. Pazolt, two sevenths for Mrs. Rhodes, and one seventh for Mr. Reggio. At the death of Mrs. Pazolt in June, 1899 (thirty-five years after the trust was created), the trust estate was valued at $1,281,000, and on May 16, 1901, her two sons received two sevenths thereof, amounting to $366,000. From that time until the death of Mrs. Reggio on April 2, 1902, the trust estate was held, two fifths for Mrs. Reggio, two fifths for Mrs. Rhodes, and one fifth for Mr. Reggio.

The period covered by the three accounts is for the four years beginning August 16, 1901, and ending August 16, 1905. These accounts were the thirtieth, thirty-first and thirty-second accounts of the trustees, and were filed on February 6, 1906. Mrs. Rhodes, one of the two remaining life tenants, appeared and objected to their allowance. Her six children also appeared in opposition. At first Mrs. Rhodes's children were represented by Mrs. Rhodes's attorney, but later Mrs. Rhodes was represented by one attorney and her children by another. Mr. Reggio, the other life tenant, is and was, during all the period covered by these accounts, one of the trustees, having been appointed a trustee in 1891. A guardian *ad litem* was appointed for Mr. Reggio's minor child, and for all persons not in being. He appeared before the Probate Court and took part in the hearings there, but he took no appeal from the decree of that court, and has not appeared in any hearings in this court, that is to say, in any hearings before a single justice or in those before the full bench.

The accounts were referred to an auditor * by the Probate Court on March 31, 1906. The hearings began on the ninth day of the following July and were concluded on December 22 of the same year. On March 12, 1907, the auditor filed an able and exhaustive report dealing with matters not now in contest, as well as those argued at the bar of this court. The accounts as amended in accordance with that report were allowed by a decree of the Probate Court † on June 7, 1907. Appeals were

---

* J. K. Berry, Esquire.          † Made by *McKim,* J.

taken from that decree to this court by Mrs. Rhodes and by her six children. At the hearing of these appeals the evidence was taken by a commissioner. The single justice who heard these appeals * made special findings of fact and ordered the entry of a decree affirming the decree of the Probate Court, but at the request of the contestants reported the case on all the evidence to this court.

During the period covered by the thirtieth and thirty-first accounts, the trustees were Mr. Laforme, Mr. Warren and Mr. Reggio. Mr. Laforme died in July, 1905 (a month before the end of the period covered by the thirty-second account), and that account is signed by the surviving trustees only. Mr. Laforme was one of the three trustees originally nominated by Mr. Carney. Mr. Warren was appointed in 1887 and Mr. Reggio as we have said in 1891.

1. The fifteenth objection to the decrees filed by the children of Mrs. Rhodes and the eleventh objection filed by Mrs. Rhodes are identical. The objection there stated is (*inter alia*) that the decree " confirms the sale or transfer of one-third interest in the so-called Dorchester Avenue property from the trustees to Andrew C. Reggio, one of the trustees, and which was unlawful."

The history of the transaction which resulted in the conveyance to Andrew C. Reggio of an undivided third of the Dorchester Avenue property is as follows:

In February, 1896, a store on Washington Street, called the Blue Store, belonging to the trust, was sold for $155,000 less a commission of $1,550, making the net amount received $153,450.

At that time Mr. Reggio was living in London, England. He had left Boston in 1876, and thereafter lived abroad until 1900, when he took up his residence again in the United States. To understand this transaction aright it should be stated that Mr. Laforme, the only one of the three who had been a trustee from the outset, was the managing trustee of this trust. Mr. Laforme had been the partner in business of Mrs. Reggio's husband, Nicolas Reggio, during his lifetime, and since Mr. Nicolas Reg-

---

* *Braley,* J.

gio's death in 1867, he seems to have attended to the business affairs of the whole family, who resided abroad after 1876 or thereabouts, but who left their property in the United States. At the time here in question Mr. Laforme held a power of attorney from Andrew Reggio, and took care of property which he had outside the trust. All Mr. Andrew Reggio's property beyond a dwelling house in Homburg (where he lived at one time) seems to have been in Boston, in Mr. Laforme's hands. Among other property belonging to Mr. Reggio was a building No. 167 Tremont Street, which apparently Mr. Reggio had been urging Mr. Laforme to sell for some time before the matters now to be stated. The news of the sale of the Blue Store was conveyed to Mr. Reggio in a postscript to a letter from Laforme to Reggio, dated February 18, 1896. In the beginning of that letter Mr. Laforme had suggested waiting to see whether the vacant chambers in 167 Tremont Street would not be let, and, if they were, a sale of that estate would not be necessary. Mr. Laforme forwarded the deed of the Blue Store to Mr. Reggio on February 28, and before he received it back from him he (Mr. Laforme) wrote to Mr. Reggio again on March 10. In that letter, after discussing some suggestions made by Mr. Reggio as to the application of the purchase money of the Blue Store, he tells him that he and Mr. Warren are considering the Dorchester Avenue property held at $252,000, and adds that if 167 Tremont Street could be sold, "I would advocate your taking an undivided interest in the wharf property for your $90,000," the estimated net proceeds of the prospective sale of 167 Tremont Street. On March 20, 1896, Mr. Laforme writes Mr. Reggio announcing the purchase of the Dorchester Avenue property on March 16, 1896, for $252,500, with an agreement to lay out $12,000 in improvements for a tenant, making a total of $264,500, the papers to be passed on April 15, 1896. He then explains that they propose to put a mortgage of $115,000 on the property, leaving $149,500 of the purchase money to be provided for out of the funds of the trust. The trust was to receive from the sale of the Blue Store a net sum amounting to $153,450, leaving in the trust $4,000 which Mr. Laforme explains is needed to pay for improvements on Myrtle and Summer Streets real estate. He then makes this proposition: "Now, if I can find a buyer

for 167 Tremont St. at $150,000 leaving you $80,000 in cash, Mr. Warren and I would propose to transfer to you 30 % of the S. Boston estate at cost price or $79,350 by applying your money to pay off $80,000 of the proposed mortgage for $115,000, which privilege we will reserve. . . . It would be a great relief all round if we can sell. . . . Our object is to reduce the mortgage and give you a good investment if your 167 should be sold. We don't like mortgages for trustees." Later in the same day he writes Reggio that the deed of the Blue Store has been delivered; that if it becomes necessary the vendor of the Dorchester Avenue property will mortgage that property for $115,000 before it is conveyed; and he ends the letter with these words: " If we find no buyer for '167' before the deed of the S. Boston est. is transferred to us we will have to make a mortgage for $115,000 and if '167' should be sold later we must come to some arrangement with the mortgagee."

On April 17 Mr. Laforme writes Reggio that the date for passing the papers in the Dorchester Avenue purchase has been postponed until the twenty-fifth; that they propose borrowing $115,000 with the privilege of paying off $80,000 or less at any time before June 10, on payment of $300 bonus for the privilege of so doing. The papers seem to have passed on that day, April 25. On May 15, 1896, Mr. Laforme, who had been in communication with Mr. Reggio by way of cable messages as to the sale of 167 Tremont Street, writes him that he has accepted an offer of $147,500 for 167 Tremont Street, giving Mr. Reggio $76,000 cash. He then writes: " Now, what Mr. Warren and I propose is to sell you one-quarter undivided interest in the South Boston property, which will take about $66,000; the trustees will apply $65,000 to the reduction of their mortgage of $115,000 leaving it $50,000 which they will assume. Your income from one-quarter will be $3,680 per an., which is really so much increase of your present income and you will have $10,000 more from No. 167 to invest." Four days later, on May 19, Mr. Laforme, writing to Mr. Reggio, says: " I have little to add, except that on further consideration Warren and I have decided it best, in case the sale of No. 167 is duly executed, to convey to you one undivided third of the coal property, you paying about $75,000 in cash and assuming one third of the mortgage incum-

brance, which would be reduced from $115,000 to $40,000 by your money. I hope you understood cash $75,000 ⅓ mortgage, $13,333.33 in all $83,333 or ⅓ of $265,000 approximately." Writing on the same day to Mr. Rhodes (husband of Mrs. Rhodes) Mr. Laforme said: " I am well satisfied with our purchase of the coal wharf but Mr. Warren and I do not like carrying so large a mortgage as $115,000 on this property. Mortgages on trust property are not considered at all the thing. Trustees generally dislike them. So we propose to Andre to convey to his [him] one undivided third of this estate at cost and apply the money to the reduction of the mortgage, provided he succeeds in selling his estate No. 167 Tremont St. which he is now trying to do. This would be desirable for both the trust and for Andre. It would reduce the mortgage to about $40,000. No. 167 has been an unfortunate investment for Andre." In a letter dated May 22, the signing of the agreement for sale of 167 Tremont Street was announced. On June 9, Mr. Laforme writes Reggio that the deed of 167 Tremont Street was delivered on June 8, and as a result he credits Mr. Reggio with $76,500, in addition to $1,000 paid to bind the bargain; that he has paid (1) $70,000 on the mortgage of the Dorchester Avenue property, and (2) the $300 bonus to the mortgagee for the privilege of prepaying part of the mortgage debt, leaving $40,000 of the mortgage outstanding. To this payment of $70,000 he added $833.33, making a payment by Mr. Reggio of $70,833.33, one third of the cost to the trustees of the equity in the Dorchester Avenue property subject to the outstanding mortgage of $40,000; being $252,500 minus $40,000, or $212,500, one third of which was $70,833.33, Mr. Reggio assuming one third of the outstanding mortgage of $40,000 and one third of the $12,000 which the owners of the Dorchester Avenue property were under obligation to lay out in improvements under one of the leases. This transaction was carried out through a deed signed by the three trustees to a third person of one undivided third part of the Dorchester Avenue property, and a deed by him to Mr. Reggio of the same property. The trustees took the entire income of the property from April 25 to June 8. In a letter to Mr. Rhodes dated June 16, Mr. Laforme wrote: " Regarding the conveyance to Andre of one

undivided third of the South Boston estate I would state that when the trustees bought the estate, they reserved the right to pay off $75,000 of the mortgage for $115,000 within a limited time, and that we would have hesitated about the purchase without this privilege, because of the risk we would run with so large a mortgage in case any misfortune were to deprive the trust of any income from the estate under the lease, while $4,800 a year would be chargeable for interest on the mortgage. This is why trustees dislike heavy mortgages. When we bought, we had in view the reduction as soon as Andre would succeed in disposing of his Tremont St. estate or Homburg estate."

The auditor found specifically that Mrs. Rhodes "had full knowledge of the transaction whereby said Andrew C. Reggio acquired said undivided interest in said wharf property in common with the trustees," and the single justice stated that he was unable to find in the evidence admitted at the hearing before him that this finding had been controlled. After a careful consideration of all the evidence we find that Mrs. Rhodes and the other life tenants were fully informed of this transaction at the time and acquiesced in it. That disposes of her objection to this transaction.

It remains to deal with the objections of the remaindermen.

It appears that bills in equity have been filed by Mrs. Rhodes and the remaindermen, seeking a reconveyance of Reggio's one third. One of these bills was filed on April 16, 1906, in the Circuit Court of the United States, and the other on April 10, 1907, in the Superior Court of the Commonwealth. The single justice found that no motion had been made in the Probate Court or in this court to postpone a settlement of these accounts until these suits had been tried and determined. He made this further finding: "Unless this conduct as matter of law amounts to a waiver, then I find as a matter of fact that the appellants have not waived whatever rights they may have to avoid the conveyance and call for an accounting and reconveyance, under the rule laid down in *Morse* v. *Hill*, 136 Mass. 60, 64; nor have they made any election to proceed in the Probate Court to charge the trustees with any excess of value rather than to seek their remedy in a court of equity."

The remaindermen are in no way interested in the question

of income, that is to say, they are not in any way concerned in the question whether the trustees ought to have accounted to the life tenants for two thirds of the income or for the whole of it.   In the latter case they would have had to account with Reggio for the use of the $70,833.33 paid to them by him, and the benefit which they had received from his assuming one third of the $40,000 mortgage and one third of the obligation to lay out $12,000 in improvements.   On the filing of these accounts the remaindermen could have stated that they were not interested in the income of the Dorchester Avenue property, and could have filed a caveat that they did not acquiesce in only two thirds of the Dorchester Avenue property being included in Schedule C, reserving the right to enforce their rights in the bills in equity.

But that course was not taken by them.   The hearings before the auditor began on July 9, 1906, after the bill in equity in the Circuit Court of the United States had been filed.   At that hearing Mr. Hoye stated that he appeared " for the children of Mrs. Rhodes," and made a statement of his objections in their behalf.   The first of these objections was in these words: " (1) I object to the transfer of the Dorchester Avenue property by the three trustees Laforme, Warren and Reggio, to one of their number, Andrew Carney Reggio, and request that that property be reconveyed by Mr. Reggio to the estate ; that he receive his money with interest and that he account to the estate for the rents and profits of the same."   The issue raised by that objection of the remaindermen never has been withdrawn, but has been finally tried out. ·

Counsel for the remaindermen have argued at great length that they do not have to elect, and have not made an election, between this proceeding originating in the Probate Court and the two bills in equity brought by them in the United States court and in the State court for a reconveyance.

And counsel for the trustees have argued that these remaindermen cannot now have a reconveyance of this whole one third in any court.   This argument is based on the fact that the sons of Mrs. Pazolt, on receiving two sevenths of the whole trust fund on her death in 1899, in terms, released the right, if any they had, to object to the acquisition by Mr. Reggio of one third

interest in the Dorchester Avenue property, and on the fact that a general release was given by Mrs. Rhodes on receiving $16,430 and a note for $120,000 assigned by the trustees as her two fifteenths of the two fifths of the whole trust fund coming to her on the death of Mrs. Reggio in April, 1902.

Whether these remaindermen are or are not to be put to their election is for the court to decide in which the bills for a reconveyance are pending, when those bills are brought on for hearing. The pendency of those bills unheard does not preclude these remaindermen from proceeding in the Probate Court for such relief as they are entitled to, based on the illegal conveyance to one trustee of property standing in the name of the three trustees.

Whether these remaindermen are or are not now entitled to a reconveyance of the whole one third interest is not a question which we need to decide in this case. If that sale was invalid, the purchasing trustee is now liable in the Probate Court to account for its actual value in whole or in part. *Morse* v. *Hill,* 136 Mass. 60, 69, 70. If they wished, these remaindermen could have had the account covering that purchase reopened. R. L. c. 150, § 17. *Parker* v. *Boston Safe Deposit & Trust Co.* 186 Mass. 393. *Bennett* v. *Pierce,* 188 Mass. 186. The contention now made in behalf of these remaindermen is in effect to obtain the decision of this court on the question of the validity of the transaction, reserving the right to retry the question, if unsuccessful here, in the courts where their bills in equity are pending. These remaindermen are not now entitled to discontinue as matter of right; and they never have asked to be allowed by the court in its discretion to discontinue this part of their case. They cannot get the benefit of a discontinuance by pointing out that this court cannot give them the remedy they now profess to prefer.

The issue originally raised by these remaindermen is one within the jurisdiction of the Probate Court, and we proceed to determine whether they (the remaindermen) are entitled to hold the purchasing trustee personally liable for the value of one third of the Dorchester Avenue property at the time of the purchase of it by him.

Mr. Warren testified that "early in March" Mr. Laforme agreed, in behalf of Mr. Reggio and as his agent, that he would

take a portion of the Dorchester Avenue property. The correspondence between Laforme and Reggio at least raises a doubt whether Laforme so understood the matter. But we do not find it necessary to come to a conclusion on that point. We assume that no binding agreement had been made between Mr. Reggio and the trustees at or before the time when the Dorchester Avenue property was bought. It is abundantly proved that neither Mr. Laforme nor Mr. Warren wanted the property as an investment of the funds of this trust subject to the burden of a mortgage for $115,000. No attempt has been made to attack the wisdom of this conclusion of the trustees, and if the attempt had been made it would have been in our opinion a hopeless one. The fact that the trustees had no power to borrow money to make investments for the trust (which we shall discuss later on) is of no consequence here. The beneficiaries do not object to the Dorchester Avenue purchase. On the contrary they say that they want the whole of it. Had 167 Tremont Street been sold on (or before) March 15, in place of on May 15, without question the contract of purchase would have been originally made in behalf of Mr. Reggio as well as of the trust. The questions which we have to decide are (1) whether the fact that the contract was originally made by the trustees alone, and (2) whether what took place after the contract was made and before the undivided third was conveyed to Mr. Reggio, one or both, prevent the trustees from carrying into effect the scheme they originally had in mind before they made the contract of purchase and which they ultimately carried into effect.

A careful consideration of all the evidence in this case, from cover to cover of the record,* has led us to the conviction that each and all of the three trustees acted in the utmost good faith from beginning to end in what they did and in what they wrote, and that full credit is to be given to their testimony and to their letters.

We find as a fact that the trustees did not think it to be for the interest of the trust to buy the Dorchester Avenue property subject to a mortgage for $115,000. We further find that the arrangement that Mr. Reggio should take an undivided part interest in the property was devised from the beginning for the

---

* The record filled six hundred and thirty-two printed pages.

benefit of the trust as well as for Mr. Reggio's benefit. In our opinion it is of no consequence that the amount of the interest which Reggio was to have was not at first decided upon. It is evident that the trustees were not prepared to let a stranger have an undivided interest in this property. How large an interest Reggio was to take depended upon how much money he was to get from the sale of 167 Tremont Street, and that could not be ascertained when the purchase was made.

The remaindermen have contended that there was a great increase in the value of the property between the purchase and the conveyance of one third to Mr. Reggio, and that under those circumstances the trustees had no right to give one third of the bargain to Mr. Reggio. They have undertaken to support this contention by proving that the establishment of the South Terminal station brought about that increase in value. On this point there was a direct conflict in the evidence. We are satisfied that there was not the increase in value which the remaindermen undertook to prove. On the contrary we are satisfied that the evidence introduced by the trustees on this point is a true statement of the situation, namely: Everybody knew that a new station was about to be established in this neighborhood, at Kneeland Street or elsewhere, and that a station on Kneeland Street would have benefited the property here in question as much as if not more than the station that was finally built.

It is true that Mr. Laforme wrote to Mr. Reggio on March 20, 1896: " We consider the purchase to be a great bargain, and if it had been delayed another day the owners would certainly have withdrawn the estate from the market — in fact we would not care to sell out to-day for less than $300,000." This letter was written five days after the purchase. We do not think it necessary to decide with great nicety whether this statement means that the trustees thought the bargain when made was worth on that day before the plans were announced some $30,000 or $40,000 more than they paid, or whether the announcement of the plan had made evident to all what the trustees recognized before and so gave an added element of value to the property. What we find to be the fact is that there was in fact no such increase in value as to prevent the trustees from thinking that after the establishment of the South Terminal

station it was still for the benefit of the trust not to retain the whole, subject to so large a mortgage. It follows that the conveyance of one undivided third of the Dorchester Avenue property to Mr. Reggio, on June 8, 1896, was not voidable.

2. The third objection to the accounts "placed upon the record" by the attorney for the children of Mrs. Rhodes apparently after the trial before the auditor had gone on for some time, was in these words: "We object to the trustees taking an estate which was unincumbered, to wit: part of the property where the Carney Building now stands, and removing the building from same and building the Carney Building, and we object for this reason: that they took an estate unincumbered and they incumbered it with two mortgages amounting to $450,000, and other debts amounting to about $38,000, substantially as testified to by Mr. Warren." The same objection is repeated in the objections filed by these remaindermen and by their mother to the decree of the Probate Court.

At the time of his death in 1864, Mr. Carney owned a building about forty feet wide, numbered 39–43, inclusive, on Tremont Street, Boston. Seven years after his death, namely in 1871, the trustees under his will bought 34 and 36 Pemberton Square, being the premises lying to the north of the northwesterly half of 39 and 43 Tremont Street.

In December, 1901, the trustees determined to erect a new building on these estates. For that purpose they bought at that time, for $28,000, the rest of the land fronting on Pemberton Square, abutting on 39 and 43 Tremont Street, making a lot of land forty feet wide on Tremont Street and thirty-nine feet wide on Pemberton Square. The building on the lot bought in 1901 was originally a dwelling house. At the time it was "mostly vacant and not rentable."

On June 19, 1902, they made the main contract for the erection of an eleven story modern building to cover the whole lot.

The auditor found that the building was completed so that the trustees became charged with it primarily for life tenants on March 1, 1904, and that it cost $448,639.22.

The two sevenths of the principal of the trust to which Mrs. Pazolt's two sons were entitled was paid to them on June 10, 1901.

The period covered by these accounts begins on August 16,

1901. Taking the valuations of the real estate used in the Pazolt distribution two months earlier, the trust property then held, two fifths for Mrs. Reggio, two fifths for Mrs. Rhodes and one fifth for Andrew Reggio, amounted to $921,209.76, invested as follows:

Real Estate:

| | | |
|---|---:|---:|
| Equity in Bedford Street | 65,000.00 | |
| Equity in ⅔ Dorchester Avenue | 213,333.33 | |
| 39–43 Tremont Street } 38–40 Pemberton Square } | 375,000.00 | |
| | | $653,333.33 |

Personal Property:

| | | |
|---|---:|---:|
| 66 Hamilton Woolen Co. | 2,200.00 | |
| Cost 5 shares Beacon Chambers, Pfd. | 450.00 | |
| "    20 bonds Conn. River R. R. | 19,247.50 | |
| "    1000 shares C. B. & Q. | 199,100.00 | |
| "    70 bonds Am. Tel. & Tel. | 70,950.00 | |
| Deposit in banks | 6,042.02 | |
| | 297,989.52 | |
| Less undistributed income | 30,113.09 | |
| | | 267,876.43 |
| | | $921,209.76 |

On April 2, 1902, Mrs. Reggio died, and on February 6, 1903, the trust estate was valued for the purposes of distribution as follows:

Real Estate:

| | | |
|---|---:|---:|
| Equity, Bedford Street | 67,000.00 | |
| Equity, ⅔ Dorchester Avenue | 223,333.33 | |
| Tremont Street and Pemberton Sq. | 500,000.00 | |
| | | $790,333.33 |

Personal Property:

| | | |
|---|---:|---:|
| Bonds | 245,000.00 | |
| 66 Hamilton Woolen Co. | 2,200.00 | |
| 5 Beacon Chambers | 450.00 | |
| Loans and cash | 17,712.80 | |
| | 265,362.80 | |
| Less accumulated income | 28,636.34 | |
| | | 236,726.46 |
| | | $1,027,059.79 |

A margin was allowed of $3,834.79, making Mrs. Reggio's share of the principal $409,290. The Pazolts were paid their one third, or $136,430, on February 6, 1903. Mrs. Rhodes and Mr. Reggio were paid $16,430 each on March 13 and May 3, 1903, leaving due to each $120,000, for which the trustees gave demand notes with interest at four per cent.

Under permission given by the Probate Court the trustees borrowed $400,000 on February 19, 1903, for five years at three and one half per cent; and on May 3, 1904, the additional sum of $50,000, at four per cent, payable at the same time, both for the purpose of erecting a building on the land to be mortgaged, to wit, the Tremont Street and Pemberton Square estates.

The appellants contend that the trustees are personally responsible for all sums expended in the erection of the Carney Building. The ground on which they rest this contention is that where there is a building on land belonging to a trust a new building can be erected on it by the trustees only when the building then on it is in so ruinous a condition that it must be torn down, so that the land is in effect vacant land. For this proposition counsel relied on *Drake* v. *Trefusis*, L. R. 10 Ch. 364 ; *In re Lord de Tabley*, 75 L. T. R. 328; *In re Montagu*, [1897] 1 Ch. 685, 693. These cases have no bearing on the question before us, to wit: Under what circumstances should trustees under a Massachusetts trust tear down an old and erect a new building on land belonging to the trust? *Drake* v. *Trefusis* was an application by trustees for leave to expend money in making permanent improvements on farm buildings. By a private act of Parliament, St. 28 & 29 Vict. c. 4, powers of sale and exchange were conferred on the trustees in that case by which they were authorized to invest moneys so derived in the purchase of estates of inheritance in fee simple, or of copyhold hereditaments. The court followed the rule laid down under the settled estates act, St. 19 & 20 Vict. c. 120. By § 18 of that act money derived from a sale made under the act was to be invested in the purchase of other hereditaments (*inter alia*). It was held that the erection of a new building on land already owned was tantamount to the purchase of land with a building and so was the purchase of a hereditament within that act. It was next held that if the building then on land held by the trust was in so ruinous a con-

dition that it must be taken down, that could be done and a new building could be erected with money derived from a sale under the act because that was tantamount to erecting a new building which already had been held to be tantamount to buying land with a building and so was the purchase of a hereditament. *In re Lord de Tabley* and *In re Montagu* were cases where the same rule was applied. The fundamental difference between the question of the power and duty of a trustee to erect a new building on trust land or to make permanent improvements on one already erected, in England and in Massachusetts, is that a trustee in England, in the absence of an act of Parliament, is confined to investing in public funds or in accordance with the directions contained in the will. See Lewin on Trusts, (11th Eng. ed.) 341, *et seq.* We have no doubt that a trustee under a Massachusetts trust would be justified in tearing down an old building owned by the trust and erecting a new one in its place when a prudent business man would do so to secure a fair return by way of income, and at the same time to maintain the corpus of the portion of the principal so invested intact, having regard to the relation which such an investment, when made, would have to the amount of the principal of the trust fund as a whole. *Harvard College* v. *Amory,* 9 Pick. 446. *Sohier* v. *Eldredge,* 103 Mass. 345. *Stevens* v. *Melcher,* 152 N. Y. 551. *Greene* v. *Greene,* 19 R. I. 619. *In re Henderson's Trusts,* 23 Grant, 45.

. The next contention of the remaindermen is that the Carney Building was erected with borrowed money and the trustees had no right under the will of Mr. Carney to borrow money. But the Probate Court, acting under R. L. c. 147, § 18, gave the trustees authority to borrow the $450,000 borrowed by them. It is urged that this order of the Probate Court is not binding on these remaindermen because notice was not served on them personally, and because no guardian *ad litem* was appointed for two of them who were at that time under age. But an application by a trustee for leave to mortgage real estate belonging to the trust for the purpose of erecting, altering, completing, repairing or improving a building on such estate is not an adversary proceeding to charge a defendant in which service must be made upon the defendant. It is on the contrary a proceeding in the nature of a proceeding *in rem* for the conservation of the trust

estate as a whole. In such a case personal service on those interested in the estate is not necessary, and reasonable notice only need be given. The case comes within *Bonnemort* v. *Gill*, 167 Mass. 338. Neither is it necessary in such a case, if the Legislature has not required it, to have a guardian *ad litem* appointed for minors interested in the estate. In this respect the case comes within *Holmes* v. *Beal*, 9 Cush. 223; *Wells* v. *Child*, 12 Allen, 330.

Lastly, the remaindermen have urged that in erecting the Carney Building the trustees did not exercise a sound discretion, and that the finding of the single justice goes no further than a finding that they acted in good faith.

The fundamental objection to the erection of the Carney Building, being an act in the exercise of a sound discretion, lies in the large proportion which that investment bears to the whole trust estate. The trustees at the outset expected the building to cost about what it did cost in the end, that is to say, about $450,000. The then investment in land was taken at $375,000 in the distribution which took place on Mrs. Pazolt's death. To this must be added the $28,000 paid for the other half of the land fronting on Pemberton Square, making the whole sum invested in the land $403,000. Of the wisdom of that purchase in case new buildings were to be erected there can be no doubt. It gave the trustees one lot substantially forty feet wide, running from Tremont Street to Pemberton Square. The value of the land when the new building was determined upon was therefore $403,000. The new building cost about $450,000, all of which was borrowed on mortgage. This single investment was an investment of $850,000 out of a trust principal of a little over $920,000. We do not see how this can be justified as the exercise of a sound discretion within the rule laid down in *Dickinson, appellant*, 152 Mass. 184, and *Davis, appellant*, 183 Mass. 499, apart from the fact that Mrs. Reggio was then over seventy years of age and for that reason a further distribution of the principal of the trust estate was not far distant. Under these circumstances it is not necessary to consider the further objection that the new building was a new enterprise.

But by the terms of Mr. Carney's will it is provided that the

trustees appointed under it shall each be liable only for his own
" wilful defaults," and that they shall not "be answerable for
any loss or damage which may happen to the trust property
without their respective wilful neglect or default."

Wilful default means intentionally making away with the
trust property and a wilful neglect means such reckless indif-
ference to true interests of the trust as to amount to or partake
of a wilful violation of duty. The difference between neglect
of duty by a trustee and a wilful neglect or default by a trustee
is not unlike the difference between the liability of one who is
bound to exercise due care and the liability of the owner of land
to a trespasser, as to which see *Aiken* v. *Holyoke Street Railway*,
184 Mass. 269; *Bjornquist* v. *Boston & Albany Railroad*, 185
Mass. 130; *Albert* v. *Boston Elevated Railway*, 185 Mass. 210;
*Banks* v. *Braman*, 188 Mass. 367; *Massell* v. *Boston Elevated
Railway*, 191 Mass. 491; *Fitzmaurice* v. *New York, New Haven,
& Hartford Railroad*, 192 Mass. 159, 162; *Lanci* v. *Boston Ele-
vated Railway*, 197 Mass. 32, 35. Mr. Laforme was doubtless
right when, more than four years before the trustees determined
upon the erection of the Carney Building, he wrote to Mr.
Reggio under date of March 10, 1896, with reference to the
buildings then on Tremont Street and Pemberton Square: "The
only possible improvement is by a new building." The error
made by the trustees was adding to this land then worth
$375,000 another lot worth $28,000, and erecting upon it a
$450,000 building, when the whole trust amounted to no
more than $920,000, in place of selling the land valued at
$375,000 with the old buildings then on it as they stood. It
seems to be pretty plain that this could have been done, for
the trustees added to the value of the land with the old buildings
on it $97,000 in the valuation of the trust fund for the purposes
of the distribution on Mrs. Reggio's death in April, 1902,
two months before the contract for the erection of the new
building was signed. In this we do not find that the trustees
were guilty of "wilful neglect or default."

Nor were they guilty of such neglect or default in making the
contract for the erection of the building in June, 1902. At that
time they were committed to the new building, or at any rate
they might well think they were so committed. They had bought

the other lot on Pemberton Square.    By agreements dated February 24 and March 31, 1902, respectively, they had agreed to buy out the Metcalf Company's lease in the old building, to pay the rent of another store for the Metcalf Company during the erection of the new building, and to lease to that company the first floor and basement of the new building for ten years at a rent of $17,000 a year.    In addition, the plans had been practically, if not entirely, completed by the architects.    For these reasons we do not think that the trustees were guilty of wilful neglect or default in making the contract on June 2, 1902.

Without going through the other matters complained of by the remaindermen, we find that the trustees have not been shown to have been guilty of wilful neglect or default in buying up the lease of Dee and that of Metcalf already referred to, in the erection of the Carney Building.*

The result is that the trustees are not personally liable for the sums expended by them in the erection of the Carney Building.

3. The appellants contend that the trustees had no authority to give the demand notes of $120,000 each as part of the distribution of the principal of the trust fund on the death of Mrs. Reggio.    In this we think that they are right.

Upon the death of Mrs. Reggio it was their duty to make a distribution of that two fifths of the principal of the trust fund of which she had received the income during her life.

In place of doing so they paid to the two sons of Mrs. Pazolt their share of the two fifths, amounting to $68,215 each.    But to Mrs. Rhodes and to Mr. Reggio, who were respectively entitled to one third of that two fifths, they paid $16,430 each and gave to each a demand note with interest at four per cent for the balance, to wit, $120,000.

The trustees have undertaken to support this action in several ways.    First, they have put forward the contention that Mrs. Rhodes and Mr. Reggio were entitled to their share on distribution and this right is an obligation of the estate which is embodied in these notes.    Mrs. Rhodes and Mr. Reggio were entitled to their share, and it was the duty of the trustees to hand it over to them.    Apart from the effect of the releases given

---

* For four leases the trustees paid $13,750.

by Mrs. Rhodes and Mr. Reggio, until their shares were handed over to them they remained in the hands of the trustees, and by reason of that fact they were each entitled to such share of the net income of the estate in addition to their two thirds and one third as $120,000 bore to the value of the trust property in their (the trustees') hands. That did not authorize the trustees to agree to pay them interest at a fixed rate. Whether the releases given by Mrs. Rhodes and Mr. Reggio can be set aside now that it is established that the trustees had no authority to give the two notes for $120,000 each is not now before us.

The next contention put forward by the trustees is that they had a right to buy up the undivided interest of Mrs. Rhodes and Mr. Reggio in the principal of the trust and to borrow money for that purpose, and if not, that they had a right to borrow these sums for the purpose of paying in part the expense of the Carney Building.

As the Carney Building cost $448,639.22, and the trustees had borrowed under orders of the Probate Court $450,000 for the purpose of paying for it, the latter part of this contention is not made out.

But the underlying objection is that these trustees had no power to borrow money. The contention of the trustees is that the borrowing of money is a necessary incident of their power to sell the trust property and to change investments. In support of this contention counsel have cited *Bradbury* v. *Boston Canoe Club*, 153 Mass. 77; *Kent* v. *Morrison*, 153 Mass. 137; *In re Jones*, 59 L. J. Ch. 31; *In re Bellinger*, [1898] 2 Ch. 534; *In re Dimmock*, 52 L. T. R. (N. S.) 494.

There are two decisions of this court directly to the contrary, in which it was held that a power to change investments does not authorize the borrowing of money: *Loring* v. *Brodie*, 134 Mass. 453, and *Tuttle* v. *First National Bank of Greenfield*, 187 Mass. 533.

It would be enough to rest this case on those decisions, although the question was not discussed at length in the opinions. But the question is one constantly arising in practice, and we think it wise to set it at rest.

The authorities cited by counsel for the trustees do not support their contention. *Bradbury* v. *Boston Canoe Club*, 153

Mass. 77, is a decision that a corporation can borrow money. In *Kent* v. *Morrison*, 153 Mass. 137, power was given to a life tenant to sell and convey the property by deed with a right to use the proceeds "for her comfort and otherwise as she may think proper." It was held that she had a right to give a mortgage on the property securing her own note, although the contrary conclusion was reached in *Hoyt* v. *Jaques*, 129 Mass. 286, where the life estate was given for maintenance with a power to sell and convey "if necessary to secure such maintenance." *In re Jones*, 59 L. J. Ch. 31, decides that an executor can pledge his testator's property to secure payment of a debt due from the testator. The right of an executor to borrow money to pay debts is established. *Crocker* v. *Old Colony Railroad*, 137 Mass. 417, 419; see also cases collected in 18 Cyc. 371. In *In re Bellinger*, [1898] 2 Ch. 534, real estate was devised to trustees for sale with authority to postpone, and in the meantime to make out of the income or capital improvements and repairs *inter alia*. It was held that repairs having become necessary in the interim a mortgage was authorized because that was the only way in which under the circumstances repairs could be made out of the capital. *In re Dimmock*, 52 L. T. R. (N. S.) 494, was another case of a trust to sell with power of postponement where a mortgage was made before the time when the trustees thought it wise to sell to raise money for a purpose to which the proceeds of the sale when made were to be applied. In other words, *In re Bellinger* and *In re Dimmock* are the application to trustees of the doctrine established in case of executors and administrators and referred to in *Crocker* v. *Old Colony Railroad, ubi supra.*

No case has come to our attention in which it has been held that by virtue of a power to change investments a trustee to whom property has been given to hold as an investment has a right to borrow money to add to the amount of the investments of the trust. A case like *Miller* v. *Redwine*, 75 Ga. 130, where a hotel was devised in trust to be operated by the trustee, stands on a different footing. *Waterman* v. *Baldwin*, 68 Iowa, 255; *Roberts* v. *Hale*, 124 Iowa, 296, are similar cases.

The giving of the two notes here in question does not come within the doctrine laid down in *Crocker* v. *Old Colony Railroad*, 137 Mass. 417, 419, and the English cases relied on by the

trustees. On the death of Mrs. Reggio it was the duty of the trustees to make a distribution of two fifths of the principal of the trust fund as soon as that could be done. No right to postpone the distribution was given to them in their discretion, as was the case in *In re Bellinger* and *In re Dimmock, ubi supra.*

The result is that the notes given by the trustees to Mrs. Rhodes and Mr. Reggio, in the distribution consequent on the death of Mrs. Reggio, are not binding on the trust, and that the sums paid on them to Mrs. Rhodes and Mr. Reggio by way of principal and interest must be disallowed.

4. Interest paid on temporary loans made on security of bonds and other securities and to be paid out of the proceeds of these bonds and other securities when sold, was a proper charge. These loans were made to get the money when it was needed and to avoid selling at a disadvantageous time. Such a temporary loan comes within the doctrine laid down in *Crocker* v. *Old Colony Railroad,* 137 Mass. 419.

5. By the accounts of the trustees as amended in the Probate Court, sums paid the life tenants for the use of the land were allowed while the Carney building was being erected, as a charge against the cost of the building and so against the principal of the trust fund. On these sums so paid the life tenants the trustees were allowed the usual compensation. In addition to that the trustees were allowed the sum of $3,600 " for extra services as trustees in constructing Carney Building."

The appellants contend that the trustees are not entitled to any compensation for their services in constructing that building, and we are of opinion that in this contention the appellants are right.

The construction of the Carney Building (for the reasons already stated) was an unauthorized investment. The effect of the special clause was not to authorize all investments made by the trustees without wilful neglect or default, but to provide that they should not be liable for the loss and damage caused thereby. A trustee is not entitled to be paid out of the trust funds for his services in making an unauthorized investment.

Were it not for the special clause in Mr. Carney's will providing that the trustees should not be answerable for any loss or damage which may happen to the trust property without wilful

neglect or default on their part, the trustees would have had to take over that building and restore to the trust the moneys belonging to the trust expended in its construction.

There are authorities which seem to hold that where full restitution has been made trustees are entitled to the usual compensation. See *Merkel's Estate,* 131 Penn. St. 584; *Makin's Estate,* 7 Penn. Dist. 126; *Winder* v. *Diffenderffer,* 2 Bland, 166; *Morgan* v. *Morgan,* 4 Dem. 353; *Kee* v. *Kee,* 2 Gratt. 116. It is not necessary to consider whether we should or should not reach that conclusion in such a case. These trustees, in place of making restitution, have availed themselves of the limitation of the trustees' liability prescribed in Mr. Carney's will, and the Carney Building, for better or worse, is now property in which a part of the corpus of this trust fund is invested.

The learned counsel for the trustees have argued that it cannot be that the trustees are not to have compensation for their services in the construction of the Carney Building because, if that be so, they never can have compensation for collecting and distributing the income earned by it while it is held in the trust. But that is not so. In building the Carney Building the trustees committed an unauthorized act, but in holding it they are not guilty of a continuing unauthorized act. For the difference between a breach and a continuing breach of a covenant, see *Doe* v. *Woodbridge,* 9 B. &. C. 376; *Gaskin* v. *Balls,* 13 Ch. D. 324; *Powell* v. *Hemsley,* [1909] 2 Ch. 252. The necessary effect of the provision made by Mr. Carney in his will is that unauthorized investments shall remain in the trust if the trustees avail themselves of their limited liability.

Lastly, the learned counsel have argued as to the $3,600 allowed for extra services that if this had not been done by the trustees they would have had to pay others for doing it, in which case the expenditure would have been allowed under the wilful neglect and default clause in Mr. Carney's will. But the wilful neglect and default clause is limited to expenditures, and therefore, although this $3,600 would have been allowed had it been an expenditure, being for compensation it cannot be allowed.

The trustees have relied on *Rowland* v. *Maddock,* 183 Mass. 360, and particularly on what is said on page 364. But what the court had under consideration there was the question

whether commissions earned were or were not forfeited by a partial neglect of duty, not whether compensation is to be paid for by making an unauthorized investment. With the exception of *Merkel's Estate*, 131 Penn. St. 584, and the other cases referred to above in connection therewith, the cases cited by the trustees are cases like *Rowland* v. *Maddock*, 183 Mass. 360.

We are of opinion that the seventh objection to the decree appealed from * is sufficient to open these questions to the appellants.

These payments for services must be disallowed.

The decree of the Probate Court affirmed by the decree of the single justice must be modified by disallowing all sums paid, whether as principal or as interest, to Mrs. Rhodes and Mr. Reggio on their respective notes of $120,000, and also disallowing Item 66 of the thirty-second account in the sum of $3,600, and so much of the following items as are commissions on sums paid to the life tenants during the construction of the Carney Building, to wit: Item 180 in Schedule E of the thirtieth account; Items 18, 43 and 84 in Schedule E of the thirty-first account; and Item 46 in Schedule E of the thirty-second account. No costs to either party.

*So ordered.*

The case was argued at the bar in January, 1909, before *Knowlton*, C. J., *Morton*, *Hammond*, *Loring*, & *Braley*, JJ. A rescript was issued on June 22, 1909, which was recalled on the suggestion of counsel that the conclusion reached involved a point which had not been argued. Written arguments were re-

---

* The seventh and sixteenth objections to the decree of the Probate Court filed by counsel for the children of Mrs. Rhodes were as follows:

" Seventh: The appellants further object for the reason that the said decree is erroneous, from the fact that it confirmed the charges made by the trustees for their commissions and compensation throughout the time covered by the said accounts, and said charges were improper and excessive and should have been disallowed as charges as against the estate, either principal or income."

" Sixteenth: The appellants further object to the said decree for the reason that it confirms and allows all of the items charged by the trustees to principal as a part of the cost of the Carney Building the certain sums paid to life tenants during the destruction of the old and the erection of the new buildings from income, which items should not have been so allowed."

Similar objections were filed by counsel for Mrs. Rhodes.

ceived on this point on October 15, 1909, and on October 20, 1909, a new rescript was issued.

*E. R. Anderson,* for Elizabeth B. Pazolt and others, remaindermen.

*F. C. Allen,* (*R. E. Smith* with him,) for Mary F. Rhodes.

*E. R. Thayer,* (*H. S. Davis* with him,) for Winslow Warren, trustee.

*J. F. Cusick,* (*J. S. Graham* with him,) for Andrew C. Reggio, trustee, and others.

*C. C. Read,* for Francis A. Peters, executor.