FRANK KRUG v. CAROLINE MILLS, Administratrix.

[No. 11, October Term, 1930.]

*Decided December 5th, 1930.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*H. Arlington Blood,* for the appellant.

*John N. Biesecker* and *William D. Roycroft,* for the appellee.

Digges, J., delivered the opinion of the Court.

This appeal is by the plaintiff below from a judgment for costs on a directed verdict at the close of the plaintiff's case in favor of the defendant. The suit is in assumpsit on the

common counts by Frank Krug against Caroline Mills, administratrix of the estate of Frank Darmsteadt, deceased, for services alleged to have been rendered the deceased in his lifetime. The pleas of the defendant were the general issue pleas and a plea of limitations. The single exception contained in the record is to the action of the lower court in granting the prayers of the defendant which directed the verdict as above stated. These two prayers challenged the legal sufficiency of the evidence on behalf of the plaintiff to sustain a verdict, and therefore we must assume the truth of the evidence offered by the plaintiff, together with all favorable inferences legally and properly deducible therefrom. In such a situation it is incumbent on us to examine the testimony in order to determine the correctness of the court's ruling on the prayers. The two questions to be determined from the evidence are: First, does the evidence show that the plaintiff was a member of the decedent's family; and, second, does the evidence prove or tend to prove such an express or implied contract between the plaintiff and the decedent as should have been submitted to the jury for its consideration?

Before reciting the facts, we will state what is the settled law in Maryand as determined by previous decisions of this court. In order to justify a claim for services against a decedent, there must have been a design at the time of the rendition to charge, and an expectation on the part of the recipient to pay, for such services (*Elosser v. Fletcher,* 126 Md. 244; *Jones v. Jones,* 146 Md. 19), or, as expressed in the case of *Bantz v. Bantz,* 52 Md. 693: "In order to justify a claim for services being allowed against a decedent, there must have been a design at the time of the rendition to charge and an expectation on the part of the recipient to pay for the services. The services must have been of such a character and rendered under such circumstances as to fairly imply an understanding of payment and a promise to pay. There must have been an express or implied understanding between the parties that a charge for the services was to be made, and to be met by payment." In *Bixler v. Sellman,* 77 Md. 496,

672

the court said: "Of course, it must be conceded that generally the law implies a promise to pay for services rendered and accepted; but a well recognized distinction exists where the service is rendered by a member of the family of the person served. In the latter case a presumption of law arises that such services are gratuitous." To like effect are *Wallace v. Schaub,* 81 Md. 598; *Gill v. Staylor,* 93 Md. 472; *Harper v. Davis,* 115 Md. 349; *Giering v. Sauer,* 120 Md. 295. It therefore appears that, if the party rendering the service is not a member of the family of the decedent, the law implies a promise on the part of the recipient to pay what such services are reasonably worth. On the other hand, if the party rendering the service is a member of the family of the recipient, the law presumes such service to be gratuitous; and, in order to recover, the plaintiff must show an express understanding at the time such service was rendered that he meant to charge for same, and that the recipient understood that he was claiming compensation; and, further, that the recipient intended to pay for same. *In Jones v. Jones, supra,* it was said: "The test is, Were the services for which compensation is being demanded rendered by one who is of the same family as the recipient; family, as here used, meaning a collective body of persons who form one household, under one head and one domestic government, and who have reciprocal natural or moral duties to support and care for each other.". In 2 *Page on Contracts,* 1183, sec. 778, the author,. citing *Bixler v. Sellman, supra,* says: "Persons who live together as members of the same family and render personal services each to the other generally do so from motives of affection and not because of the expectation of a financial reward therefor. Accordingly, the mere rendition of personal services between persons so situated does not establish a liability on the part of the person receiving such services to make compensation to the person rendering them, even though the services may be performed at the express request of the person receiving the benefit thereof, or may be voluntarily accepted by him." In *Pearre v. Smith,* 110 Md. 531,.

it was said: "In our view, although the appellee was not a blood relation of the decedent and his sister, she should, upon the undisputed evidence in the case, be regarded as having been a member of his family. The word 'family' is often used in a restricted sense to describe a group of persons connected by ties of kindred, such as parents and children, but it has a variety of meanings according to the connection in which it is used, and it should be so construed in each case as to give it the significance appropriate to its use." Webster defines the word "family" to be a collective body of persons who live in one house and under one manager; and that meaning has been approved in many cases. *Bouvier's Law Dictionary,* vol. 1, p. 758, says that "in common parlance the family consists of those who live under the same roof with the *paterfamilias,"* and also cites different cases as authority for the definition of the word "family" as taken from Webster. The words "family" and "household" are often interchangeably used. In *Pearre v. Smith, supra,* it was held that the plaintiff was a member of the decedent's family in accordance with the definitions above set forth, even though she was of no blood relationship; and, conversely, it has been held by this court that persons who were closely related by blood were not members of the same family so as to raise the presumption that services rendered by them were gratuitous. In *Gill v. Staylor, supra,* the relationship was that of nephew and uncle; and in *Neudecker v. Leisler,* 132 Md. 571, and *Bouic v. Maught,* 76 Md. 440, cases of aunt and niece, it was held that such blood relationship did not make them members of the same family. In the last-mentioned case the court said: "It is not to be inferred simply from the relationship that existed in this case between the parties that the services were intended to be gratuitous and were rendered with no view of compensation." In the *Neudecker* case this court said: "It does not seem to us that the services thus rendered should be regarded as presumptively gratuitous. The kinship of Mrs. Neudecker to her aunt was

674

not sufficiently close of itself to create such a presumption." The question, therefore, is not one of nearness of blood kinship, but whether or not the party rendering the service is a member of the family of the decedent, as the word family has been defined and construed by former decisions of this court when dealing with this class of cases. With the law being thus firmly established, the question is: Does the evidence in this case constitute the plaintiff a member of the decedent's family? We think it does.

The record shows that the plaintiff is the nephew of the deceased; that the uncle owned a house and parcel of ground on the water front in Anne Arundel County; that the plaintiff in 1911, when he was thirteen years of age, was living with his mother in Baltimore City; that the uncle was at that time living alone, and desired his nephew as a companion. The mother of the plaintiff was told this by the uncle, and she was asked to allow the uncle to take the boy to his home to live. This the mother was satisfied to do, she knowing, as she states, "he was taken care of." In addition, the deceased was the boy's godfather, and, from the time in 1911 when the boy went to live with the uncle, acted as a father and "was very good and kind to him." The mother never visited her son from the time she turned him over to the uncle in 1911 until the summer of 1928. The uncle gave the plaintiff his board, lodging and clothes; the plaintiff lived in the same house with the uncle, each doing a part of the household work, and the boy assisting the uncle in crabbing and fishing, which appears to have been the principal occupation of the deceased. It is apparent from the record that the mother regarded her son as a member of the uncle's family, for she says, "they just lived to themselves as one family," speaking of her son and his uncle. The plaintiff had three brothers and one sister, who lived at home with their parents. The plaintiff left his uncle in December, 1919, and sought employment elsewhere, at which time he was about twenty-one years old. During the period of about nine years, from the time of his arrival at twenty-one years of age to the time of

his uncle's death, the plaintiff worked for several different employers, one of whom was Mr. Thom, who owned a farm in Anne Arundel County a short distance from the home of the uncle. His service for Mr. Thom covered a period of about two years, during which period, except in cold weather, when the water was frozen, the plaintiff lodged and boarded at the home of his uncle, going each day from his uncle's place to Mr. Thom's for his work; and during all of which time he paid board to his uncle. This period was from 1925 to 1927, and was from six to eight years after the termination of his service to his uncle, for which he now claims compensation. It is clear, under the previous decisions of this court, that the plaintiff was a member of his uncle's family; and therefore any service rendered by him to the uncle while such status continued, the law presumes to have been gratuitous. In *Provident Trust Co. v. Massey*, 146 Md. 34, we said: "If the parties are members of the same family, the law presumes that at the time the services were rendered there was no intention to charge and pay for them, and requires clear and satisfactory proof from disinterested sources to overcome this presumption." When through a series of years the claimant's conduct was irreconcilable with his claim, it may not be allowed without clear and satisfactory proof from credible sources. *Bagby's Md. Law of Exec. & Adm.*, p. 113; *Duckworth v. Duckworth*, 98 Md. 98; *Lowe v. Lowe*, 111 Md. 118; *Elosser v. Fletcher, supra; Huff v. Simmers*, 114 Md. 553; *Pearre v. Smith, supra; Bantz v. Bantz, supra*. In the last cited case, which was a claim for services made by a son against the estate of his mother, the court, speaking through Judge Irving, said: "It is not denied that the claimant did do many frequent and most useful services for his mother, as a considerate and loving son would do; * * * but we see nothing in the proof tending to show an expectation on his part to make a charge and be paid accordingly, or on her part of expectation that she was to pay for the services as for services rendered by any other person. The only declarations made by the testatrix offered in evidence (which

are very few, considering the period covered by the services), certainly imply that there was no understanding on the subject; on the contrary would indicate that the mother had no idea he was making a charge against her. They indicate appreciation of his attention to her and her business; but they exclude the idea in her mind that he was making a charge for the service. In view of the service, its character, its duration, the conduct of the parties, the fact that no information was ever given the testatrix of intention to charge, that no price was fixed until after her death, * * * we cannot think the declaration of the mother at one time that he 'should not be the loser,' and at another that he 'should be well paid,' could have any reference to any payment other than by gratuity by will. That he so understood it is irresistibly indicated by the lapse of time he permitted to pass without hinting a purpose to charge for it." What was there said is applicable to the case at bar. Here the service lasted for about seven years, and the declarations of the uncle, testified to in respect to his intention and purpose to pay for such services, are exceedingly few, considering the period over which they extend, amounting as it does to nearly seventeen years, and such as they are, indicate nothing more than a purpose to reward the nephew by testamentary disposition, and are not sufficient to support a claim against a deceased's estate. *Lee v. Lee,* 6 G. & J. 316; *Bantz v. Bantz, supra; Brendel v. Strobel,* 25 Md. 395; *Giering v. Sauer, supra.* In the last case it was said: "It is familiar law that if services are rendered with the expectation of compensation by will, a charge cannot afterwards be preferred against the person for them." The court, in *Lee v. Lee, supra,* said: "It is a case which to the letter comes within the familiar principles stated by Lord Kenyon in 1 *Esp. Rep.* 108, *Le Sage v. Consmaker and others, Executors,* that if the services were rendered by the plaintiff 'without any view to a reward, but with a view to a legacy, that he could not set up any demand against the testator's estate.' "

In the present case the mother of the plaintiff testified:

"My brother said to me, let me have the boy to work for me, and help me, and I am going to pay him, and he said he would get it when I was gone. That he would talk about her son, that he would say, that boy has been looking after me all my days, talking of taking care of me when I was sick. That it was about six months after my son was placed with my brother that my brother first visited me. That her brother said on various visits, that boy has been with me all these years working for me and helped to earn that money, and he is going to get it some day when I am gone, it will be there for him. That the last Monday that he came to my home prior to his death, we were in the kitchen talking, and he said to me, everything will be all right, and don't forget, when I am gone, that boy gets all that I have got, he worked for it and helped to earn it, and taken care of me when I was sick, and helped me all the time, and when I am gone he is going to get it, that the boy always was with me as a companion, taking care of me, when I was sick, he worked for me and helped to earn that money and he is going to get it when I am gone. He said, I am going to have the boy with me to work for me, and what he earns I am going to save and put away for him."

Conrad Backert testified: "In 1917 I was drafted into the army, and Mr. Darmsteadt was at my house, and we were sitting at the table eating, and my father said to him, Well, Frank, I am losing my boy, he says, how is your boy down there? He says, well, they aint bothering him. He says, well, how do you pay that boy? He says, well, I tell you, Mathis, he says, I don't pay that boy anything, but when I die what I have got will go to that boy, he says, that pay he will receive, but I am taking care of him while he is with me."

Benjamin Marks testified: "Darmsteadt would come and tell him about Mr. Krug, about not paying him anything, and he was going to take care of that boy and look after him, and if anything should happen to him the boy was going to get what he had, and that is all he ever told me; that he told me this the last time in 1927, the third week in November."

Jennie Schamel testified: "Darmsteadt always said that he did not pay the boy anything, and I would say to him, why didn't he pay him something, when he comes to the city the boy wanted something, and he said it was no use to pay him anything, he could not spend it in the country, but when anything happened to him the boy would be well provided for. This statement was made to her the last time in the spring of 1927." Being asked why she had a conversation with the uncle instead of with the boy, she said: "Because I thought it was the uncle that should be consulted and not the boy. Q. Did you ask the uncle why he would not give him some money or why he did not pay him something then? A. Then he would answer, when he was to pass out what he had was to go to the boy. Q. So he was to get nothing at all while he lived, is that correct, is that right? A. He didn't pay him anything, that is right. Q. But he was to give him nothing at all while he lived. Did he say anything about how much he would give him? A. No, sir. What he left was to go to Frank."

The nephew lived with the uncle, performed services which are usually and incidentally performed by a member of the family for other members of the same family, and undoubtedly was highly regarded by the uncle, which made it natural for the nephew to expect that he would be remembered by his uncle through a will, especially in view of the fact that the record discloses that the only child of the deceased lived apart from her father and never visited him or had any association with him for many years prior to his death. That this was the true situation is emphasized by the fact that the nephew paid board to the uncle when staying at his uncle's home six or seven years after the rendition of the services for which compensation is now sought, and at a time when the uncle, according to the present contention, owed him (the nephew) a large amount for the services rendered. *Provident Trust Co. v. Massey, supra.*

We are not unmindful of the fact that, in considering the question under the prayers in this case, we are not passing

upon the weight of the evidence, but upon whether there is any evidence legally sufficient to take the case to the jury. Having determined that the plaintiff and the deceased were members of the same family, the law presumes that any services rendered was gratuitous, and in order to rebut such presumption it is incumbent upon the plaintiff to show by clear, satisfactory, and unequivocal evidence that there was at the time the services were rendered an intention on his part to make a charge for his services, and a corresponding purpose on the part of the deceased to pay for same. This, in our judgment, the plaintiff has failed to do; and we find no error in the ruling of the lower court directing a verdict for the defendant.

*Judgment affirmed, with costs.*