LEWIS F. BLENARD, SR. v. MARIE E. BLENARD, ET AL.

[No. 59, October Term, 1945.]

*Decided January 9, 1946.*

The cause was submitted to MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*John Wagaman* appeared on the brief for the appellant.

*Samuel C. Strite* appeared on the brief for the appellee.

MARKELL, J., delivered the opinion of the Court.

On June 8, 1936, Marie E. Blenard (plaintiff, appellee) and Lewis F. Blenard, Jr. (defendant, appellee) were married. On February 27, 1940, they acquired as tenants by the entireties, a lot on Salem Avenue in Hagerstown on which to erect a house. He was then employed at the A. & P. store, later on the Hagerstown police force. She was employed, until some time in 1942, at Montgomery Ward's. His father, Lewis F. Blenard, Sr., (defendant, appellant) owns and works a 43-acre farm on the Hopewell Road several miles outside Hagerstown. In 1940 he was the only man doing the farm work; he was then 60 years old. He lived on the farm with his wife, his daughter and her husband and their 12 year old son.

The Salem Avenue house is a one and one-half story stone dwelling with modern conveniences. Excavation for the foundation was begun in April, 1940, and completed in October or November. Construction of the foundation was then begun and was completed in the spring of 1941. In September or October, 1941, the husband and wife moved into the house. Almost all the work done on the house was done before 1943. The house, however, was still unfinished when the marriage collapsed. Marital trouble arose about October 1, 1943, and resulted in a divorce, granted on the wife's cross-bill in Washington County on July 3, 1944.

When the husband and wife undertook the erection of the house, they had little money. Her father paid $500 for the lot—or an adjoining lot acquired by them in April, 1943, or both lots. He also gave them the posts for the back porch. A friend of theirs, Roy Smith, did some work, without charge, in the erection of the house. The husband himself, and sometimes the wife, when they had free time, worked on the house. Most of the work was done, and almost all the stone was furnished by his father, who was paid nothing. What stone was not furnished by the father was given to them. On April 14, 1941, the husband and wife borrowed $1,000 on a mortgage, and on June 23, 1941, $500 on a second

mortgage, from Mrs. Emma J. Blenard (defendant, appellee), a sister-in-law of Blenard, Sr., and an aunt (by marriage) of Blenard, Jr. Mrs. Blenard lives near the farm and visits there almost every day. Later the husband and wife borrowed $450 from an uncle of the husband, all of which, except $100, was repaid out of their joint bank account.

In 1940 Blenard, Jr., and his wife frequently went to the farm for dinner or supper, principally at week-ends. Soon after they acquired the lot they were at the farm, and the house was discussed. Blenard, Sr., said he would furnish stone and such labor as he could to build the house. On subsequent occasions he repeated this statement. On the first occasion, Blenard, Sr. and Jr., testify the son told the father he would pay him 40 cents an hour for labor and $1.25 a ton for stone, the father "to keep track of his time." The son says, "I * * * told him I did not know when I would pay him but I would pay him some day." The father says the understanding was, "He was to pay me when he had the money to pay me." "I insisted on helping him, he asked me, I said I would help him and he could pay me whenever he seen fit, later on when my work was done." "I was the last one, I was to wait for mine until the rest was off of his hands." The father says this was the only time he and his son discussed this agreement. He says, at the time of the second mortgage the son, in the presence of Mrs. Blenard, Sr., and Mrs. Emma J. Blenard, "said he had to borrow $500 more or more than that if I would not help him out or won't wait for mine and I agreed to wait on mine, do what I could to help him out so he would not have to borrow any more money." The son testifies to the same effect; Mrs. Blenard, Sr., does not remember what the original conversation between father and son was, and neither she nor Mrs. Emma J. Blenard was asked about any conversation concerning the second mortgage.

Blenard, Jr., says his wife was not in the room during either of these conversations, and that he never told her

what he had agreed to pay his father for labor or stone. He says he told her, before the first conversation, "we could not get my daddy unless we paid him," "I would get dad and pay him but possibly not pay him as much as other people." The father says he did not have any dealings with her. She says she never discussed, with Blenard, Sr., or Jr., anything about the compensation to be paid the father or the price to be paid him for any stone, and the father never said anything to her about being paid for his work; he never asked them for any pay in any way. She would have been willing to pay him, if they had had an agreement. If he had said he wanted to be paid, he would have been paid. Her husband never told her that his father was to be paid but would be postponed because of money shortage until the other workmen were paid. She first learned of the existence of the father's claim against the property several months before the divorce; her husband then told her that if she did not accept an offer of settlement he made her, she would not have anything because he was going to get his father to file a mechanics' lien against the house. The husband denies any such statement. Both Blenards, Sr. and Jr., deny that the son instigated the filing of a mechanics' lien claim by the father.

On January 26, 1944, Blenard, Sr., filed a mechanics' lien claim against the house and lot for $2,660, "due and payable to him for work and labor done and materials furnished in, upon and about said house within six months last past for Lewis F. Blenard, Jr., and Marie Elizabeth Blenard, his wife, the owners or reputed owners of said house and lot, the nature and details of which work, labor and materials are particularly set out in the subjoined itemized account filed herewith as part of this claim." The account was for "The following labor and materials furnished to, for, in, upon and about the building known as 1304 Salem Avenue from 1939 to September 1, 1943:

"585 days of labor at $4.00 per day...... $2340.00
" 20 days use of two horse team at $2.00
    per day ....................... 40.00
"224 tons of stone at $1.25 per ton........ 280.00

    Total ....................... $2660.00"

On July 14, 1944, Marie E. Blenard filed a bill against the Blenards, Sr. and Jr., and Mrs. Emma J. Blenard, alleging that the Blenards, Sr. and Jr., "conspired, connived and schemed together to file the fictitious Mechanics' Lien in an attempt to deprive the complainant and others of their lawful rights and interest in and to the aforesaid property," that the work done or materials furnished by Blenard, Sr., were furnished as a gratuity without any expectation of payment therefor, and the lien would not have been filed had Blenard, Jr., and his wife remained married and if the Blenards, Sr. and Jr., had not so conspired to defraud and cheat her, that the house was erected and completed more than six months prior to the filing of the claim, and praying that the lien be declared void. The Blenards, Sr. and Jr., answered, denying conspiracy, asserting the validity of the mechanics' lien, and alleging that Blenard, Sr., furnished materials and performed labor "pursuant to an entire contract," made by him with the plaintiff and Blenard, Jr., that he should furnish sufficient stone for the erection of the dwelling and "should perform such work * * * in and about the erection * * * of said dwelling as he was able to perform until the same should be completed."

Testimony was taken in open court on January 15 and 16, 1945. On January 15th Blenard, Sr., filed an amended account, showing the same totals as the original account, and also itemizing by dates days and half-days of labor aggregating 585 days, and by months the number of days' use of the horses. He testified that each day, when the work was done, he kept a record of the day (or half-day) in the Hagerstown Gruber Almanac,

that on each full day listed in the account he did ten hours work, on each half-day four hours—or six or seven.

The itemized account begins, not in 1939 but on April 4, 1940. From April 8, 1940, to September 30, 1940, 25 weeks, the account shows a full day's work for every weekday (60 hours a week), including the Fourth of July and other holidays. After five days' absence in the first week in October, the account then shows for 18 weeks, from October 7, 1940, to February 8, 1941, 12 half-days on Saturdays and a full day every other weekday, including Thanksgiving Day, Christmas and New Year's Day, *i.e.*, regardless of weather and of the fact that many of these days contained less than ten hours of daylight. Harvey Grove, the stone-mason who, with the assistance of Blenard, Sr., built the foundation, testified that they "started there late in the fall, it got cold, then we went off until about March the first." "When the days were fit we were there pretty regularly all of the time when it was pretty and we could work, but lots of days we could not work, it would get cold." After two weeks' absence in February, the account shows, for 18 weeks from February 24, 1941, to July 5, 1941, a full day's work for every weekday except one (Saturday, June 28th), not excepting July 4th or any other holiday. After one week's absence in July, the account shows, for 23 weeks from July 14, 1941, to December 20, 1941, a full day for every weekday, including holidays. The account shows no more work till April, 1942, 53 full days in April, May and June, 24 in the next six months, and nine days in 1943, including only three full days and two half-days within six months of January 26, 1944. The plaintiff says Blenard, Sr., did not work on the house in 1943.

Blenard, Jr., testifies that he never saw the itemized account before it was filed. His father had never rendered him a detailed account. When he talked over his marital difficulties with his father, he never discussed this obligation that he owed his father, and his father

never mentioned the fact that the son was obligated to the father. The father first mentioned it in December, 1943, when he asked the son to go with him to his lawyer. The son went with him, and the mechanics' lien was discussed with the lawyer. On cross-examination the son was asked, "How much do you owe your father?"; he replied, "I really don't know."

By the divorce the tenancy by the entireties was converted into a tenancy in common. *Reed v. Reed,* 109 Md. 690, 696, 72 A. 414, 130 Am. St. Rep. 552. Proceedings were brought for the sale of the property in lieu of partition. Code, 1939, Art. 16, Sec. 159. There being no dispute as to the propriety of a sale, trustees were appointed and the property was sold (in its not entirely completed condition) for slightly more than $7,000. By stipulation, the liens, if any, upon the property were transferred to the proceeds of sale.

Section 11 of Article 63 of the Code requires that if the contract for furnishing work or materials is made with any person except the owner of the lot or his agent, notice in writing of intention to claim a lien be given to the owner or agent within sixty days. It is conceded that no such notice was given. If, in making the alleged contract, the husband was the agent of the wife, no such notice was necessary. *Adkins & Douglas Co. v. Webb,* 160 Md. 571, 574-576, 154 A. 259. Whether Blenard, Jr., was his wife's agent in making the alleged contract with his father, is therefore a crucial question. Our conclusion on that question makes it unnecessary to decide whether the claim filed on January 26, 1944, was filed within six months after the work was finished, as required by Section 23 of Article 63.

Section 1 of Article 63 provides that in the counties every building erected shall be subject to a lien for the payment of "all debts contracted" for work done or materials furnished for or about the same. No person having such lien shall be considered as waiving the same by granting a credit, but the sole effect thereof shall be to prevent the institution of any proceedings to enforce

the lien until the expiration of the time agreed upon. Art. 63; Sec. 3. The lien of every such debt for which a claim may have been filed shall expire at the end of two years [five years, until amendment by Acts of 1939, Ch. 754] from the day on which it was filed, during which time proceedings in equity may be brought by the claimant to enforce the lien or by the owner to compel the claimant to prove the validity of the lien or have it declared void. Art. 63, Sec. 28.

To establish the validity of the lien claimed in this case it must appear that (*a*) by the alleged contract between father and son a debt was contracted, (*b*) the contract purported to make both husband and wife debtors and (*c*) in making the contract the husband was the agent of the wife. In effect, the lower court held that (*a*) and (*b*) were established and (*c*) was not. In this disposition of the case we find nothing of which the appellant can justly complain.

The slightly varient versions of the alleged contract between father and son all fall short of an obligation to pay at any definite time. "I told him I did not know when I would pay him but I would pay him some day." "He was to pay me when he had the money to pay me" —"whenever he seen fit." "I was the last one, I was to wait for mine until the rest was off of his hands." It seems questionable whether the alleged contract (*i*) is an enforceable contract to pay when able (*Pistel v. Imperial Mut. Life Insurance Co.,* 88 Md. 552, 557, 558, 561, 562, 42 A. 210), or (*ii*) is too indefinite to create any enforceable obligation (*Blackistone v. German Bank,* 87 Md. 302, 318-320, 39 A. 855; *Thomson v. Gortner,* 73 Md. 474, 481-483, 21 A. 371) or (*iii*) is not even intended to create a legal obligation. *Barnard v. Cushing,* 4 Metc., Mass. 230, 38 Am. Dec. 362. There is no evidence that "he had the money to pay." Moreover, a contract to be "the last one" paid is foreign to the nature of a mechanics' lien. The lien is designed to put the claimant first, not last—to protect him when the owner "has not the money to pay" and does not "see fit to pay."

Nor is it clear that the alleged contract even purported to bind the wife. She was not mentioned in the conversation. To say that the husband spoke for the owners would beg the question. A husband may contract alone for work on his wife's property. A father may contract with his son, without contracting with the son's wife. Neither the existence of the relationship of husband and wife, standing alone, nor knowledge by the wife of the husband's intention to construct a building on her land, together with failure on her part to object, is sufficient to constitute him her agent in constructing the building. *Adkins & Douglas Co. v. Webb*, 160 Md. 571, 577, 154 A. 259. This is equally true of property owned solely by the wife and of her interest in property owned by herself and her husband as tenants by the entireties. *Kvedera v. Mondravitzky*, 145 Md. 260, 263, 125 A. 591.

The question whether services were rendered gratuitously or for compensation has frequently been considered by this Court with respect to claims for services against decedents' estates. In order to justify such a claim there must have been a design at the time of the rendition to charge and an expectation on the part of the recipient to pay. *Krug v. Mills*, 159 Md. 670, 671, 152 A. 493. Whether such an understanding may be implied may depend upon application of the so-called family relationship doctrine. Sometimes the presumption of gratuitous service by a member of the family has been held applicable to persons not related by blood or marriage. *Pearre v. Smith*, 110 Md. 531, 73 A. 141. Sometimes it has been held inapplicable to persons who are so related. *Neudecker v. Leister*, 132 Md. 571, 104 A. 47. The appellant contends that it is not applicable to the father and the son's wife because they were not members of the same "household."

On a question whether there is sufficient evidence to take an issue to the jury, especially when the lips of both parties to the transaction are sealed by death or by the Evidence Act, such presumptions are often helpful or

necessary. When the Court is the trier of the facts and all parties concerned are living and testify, there is little occasion for resort to presumptions. Professor Williston says: "It is a question of fact if services are accepted whether a reasonable man in the position of the parties would understand that they are offered in return for a fair compensation, or would rather suppose either that they are offered gratuitously, or if not, that the recipient might think so. It is customary to lay down presumptions, as that 'with respect to strangers a contract for compensation will be implied unless a contrary situation is indicated,' whereas as between relatives 'a contract alleged to exist must be affirmatively shown.' But it is undesirable to lay too much stress on such presumptions. They are mere inferences of fact. Intimate friends sometimes render services gratuitously, and how close must relationship be to make one presumption or another applicable? The question is purely one of fact, varying in each case, but with the burden always on the party, who alleges a contract and seeks to enforce it, to prove its existence. Family relationship is of course important, * * *. But the circumstances vary in every case, and there should not be any attempt to build up a variety of legal presumptions to meet them." *Williston on Contracts* (Revised Ed.), Sec. 36, *CF.* Sec. 91A.

Both of the opposing presumptions, (1) of gratuitous service by a member of the family and (2) of an unqualified obligation to pay the reasonable value of the services, are excluded by the testimony of the father and son. Their alleged contract consists of their own special terms, which cover the entire subject matter and are incompatible with recovery on a *quantum meruit*—and likewise incompatible with an implication of agency. The contract does not include the wife at all. The appellant fails to prove the existence of a contract with her; he shows the absence of any such contract.

The appellant contends that the wife's conduct shows her testimony to be incredible in that she never expressed gratitude for the father's gratuitous labors.

Gratitude may be expressed or implied by different persons in different ways or not at all. In this case any debt of gratitude would not be appreciably diminished by the husband's version of the alleged contract. The prospect of payment would be remote and imperceptible. The lower court, which saw and heard the witnesses, found no balance of credibility in favor of the husband's testimony as against the wife's; we find none. As the lower court says, this case is an aftermath of the divorce. The wife's contention that the alleged indebtedness is an afterthought is not without support in the facts.

The appellant also contends that his mechanics' lien was valid as against the husband's interest as tenant by the entireties and became enforceable upon conversion of that interest into tenancy in common. In Maryland a tenant by the entireties has no separate interest which can be seized and sold on execution and can therefore be subject to the lien of a judgment against him alone. *Jordan v. Reynolds,* 105 Md. 288, 66 A. 37. For like reasons we think he has no separate interest which can be subjected to a mechanics' lien for a debt contracted by him alone. Manifestly no proceedings against the husband's interest as tenant in common can operate retroactively so as to subordinate the lien of the mortgages and thereby subject the wife's interest to liability for more than half of the mortgage debts.

Doubtless the appellant never intended to create by his labors a settlement for his son's divorced wife. It may be that a nice sense of fitness or a spirit of independence on the wife's part would not have permitted her to retain the fruits of the father's labors. The law does not impose or enforce canons of taste in domestic discord. Disappointed hopes and expectations are normal consequences of a divorce. With respect to property rights, divorce does not undo, but expressly affirms, the original marriage, and therefore does not restore the parties to their former condition, but places them in a new one. All transfers, including gifts between the

parties or from others, abide. *Reed v. Reed,* 109 Md. 690, 694, 72 A. 414.

If the husband's filial gratitude extends further than his desire to thwart his former wife, our decision will not prevent him from applying his own share of the proceeds of sale of the property toward the discharge of any legal or moral obligation to his father.

*Decree affirmed with costs.*