SULLIVAN ET UX. *v.* MOSNER ET AL.

[No. 17, September Term, 1972.]

*Decided October 12, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Roy D. Cromwell* for appellants.

*David L. Bowers* for William F. Mosner, part of appellees. *Thomas G. Bodie* for C. Arthur Eby, Jr., et al., other appellees.

SMITH, J., delivered the opinion of the Court.

Appellants, Timothy F. Sullivan (Sullivan) and Mary Jane Sullivan (Mrs. Sullivan), his wife, (the Sullivans) bought a partially completed home in Anne Arundel County from Municipal Savings and Loan Association, Incorporated (the Association), one of the appellees. They entered into a contract with a builder to complete the home. The Sullivans deposited with appellees, William F. Mosner (Mosner) and C. Arthur Eby (Eby), as trustees (the trustees), a sum of money equal to the amount of the contract with the builder, part of which they borrowed from the Association.

The Sullivans sued Mosner, Eby, and the Association in equity. They alleged that the trustees "carried out their duties with reckless indifference to the interest of

the beneficiary"; that they "failed to carry out the terms and conditions of the Trust agreement with ordinary skill and diligence required of Trustees"; that they "were delinquent in carrying out their duties"; that "the trust fund did not accomplish its purpose due to mismanagement and misapplication of the trust funds by the respondent Trustees"; and that $11,918.98 had "been wrongfully disbursed from the trust fund by the defendant Trustees, said disbursements not being in accord with the terms and conditions of the said Trust Agreement," among other things. They prayed that Mosner, Eby, and the Association might be directed "to recompense [the Sullivans] out of their private funds for all of [the Sullivans'] losses and damages"; that they also "be ordered to replace, pay back, all those funds, sums of money, improperly or wrongfully disbursed from the trust fund so that [it might be] restored to its original sum of Twelve Thousand Two Hundred Fifty Dollars ($12,250.00)"; that the trustees be removed and a disinterested party appointed to act as trustee, and that they "be awarded a reasonable attorney's fee from respondent's [sic] private funds for services performed in enforcing Petitioners [sic] rights under the Trust Agreement." The president of the Association was named in the trust agreement to act in place of any trustee who might be unable to perform his duties under the agreement.

The Association had made a construction loan to a contractor on subject property. Default took place prior to the completion of the home and the Association was obliged to buy it in at the foreclosure sale.

The Sullivans had been living in Pittsburgh. He went house hunting after his transfer to Maryland. After he spied this partially completed home, his inquiries led him to Frank Vavra (Vavra) who was associated with the original builder. Vavra in turn referred the Sullivans to Mosner, the attorney for the Association. Sullivan and Mosner met relative to purchase. Sullivan was advised to have a contractor look at the house and give a

price for its completion. Mosner specifically advised Sullivan to obtain a contractor other than Vavra.

Sullivan approached several contractors. Time was important insofar as the Sullivans were concerned. They ultimately selected Vavra to complete the home because he quoted the lowest price and because they believed, on the basis of Vavra's having been involved in the original construction, having the original plans and having derived knowledge and familiarity from his earlier work, that he could complete the house in less time.

The Sullivans ultimately purchased the home from the Association and entered into the trust agreement to which we have previously alluded. The first paragraph of that agreement recited the deposit of $12,250.00 with the trustees; that the sum so deposited was to be placed by the trustees in such financial institution as they might deem proper; that it was not to be assignable by the Sullivans; and that the home was to be completed "on or before six months from the date [thereof]." Then follow subparagraphs (d) and (e) which are in controversy and which we reproduce in their entirety:

"(d) Following inspection and approval by such person or persons as may be designated by the Trustee from time to time, the Trustee shall pay to the Owner, except as hereinabove otherwise provided, the installments due in accordance with the following schedule of payments:

"(e) And in addition to the Six Thousand Dollar Mortgage money that the Owners have deposited with the Trustees the said Owners also agree to deposit an additional Six Thousand Two Hundred Fifty Dollars of their own monies to be used in completion of the construction of said house and to be disbursed along with the other Six Thousand Dollars as follows:

1. Contractor shall submit a list of his

subcontractors and supplies [sic] to William F. Mosner, agent for Owner, and they shall, upon completion of their work or supplying of materials, submit bills to the agent who shall thereupon make payment of the amounts due less a retainage of ten percent.

2. The retainage shall be paid to the subcontractors and suppliers thirty days after completion of the house.

3. The difference between the amount paid to subcontractors and suppliers and the contract price shall be paid to the contractor upon completion, less ten percent which shall be paid as specified in '2' above."

The agreement contained an exculpatory clause releasing the trustees from any "personal responsibility" and providing that no claim should be made against them "in excess of a sum of money paid into their hands or such balance therefore [sic] as may be remaining and undisposed of in accordance with the terms and agreements [therein] set forth."

Simultaneously with the conveyance and trust agreement a construction contract was entered into between the Sullivans and Vavra for completion of the home, which reads in part as follows:

"3. The Owner shall pay the Contractor for the performance of the contract the sum of twelve thousand two hundred fifty ($12,250.00) dollars as follows:

A. Contractor shall submit a list of his subcontractors and supplies [sic] to William F. Mosner, agent for Owner, and they shall, upon completion of their work or supplying of materials, submit bills to the agent who shall thereupon make payment of the amounts due less a retainage of ten percent.

B. The retainage shall be paid to the sub-

contractors and suppliers thirty days after com-
pletion of the house.

    C. The difference between the amount paid
to subcontractors and suppliers and the con-
tract price shall be paid to the contractor upon
completion, less ten percent which shall be paid
as specified in 'B' above."

The contract was dated November 8. Work was to "be
completed within forty-five days," which would have
permitted the Sullivans to move in by the first of the
year, if not by Christmas.

    The first payment to Vavra was made on November
22, 1968. Mosner said on that date Vavra came to his
office with bills for certain materials he had purchased
for the house and for work that Vavra and his employees
had done. Mosner told him he could pay him for the
materials, but he could not give him any money for his
own expenses because under the contract he had to wait
until the job was finished. As Mosner put it, Vavra at
that point "jumped up and down and raised the roof,"
but Mosner stood firm. Vavra said he would call Sullivan
and get him to call Mosner. Mosner's version of the call
he then received from Sullivan is as follows:

    "Mr. Sullivan told me Mr. Vavra had called
him, told him of my conversation with Vavra,
that I wouldn't give him any money, and told
me Mr. Vavra said he was going to pull off the
job, that he had to have money to pay his peo-
ple as work progressed, and that if he didn't
get it he was going to leave. Mr. Sullivan told
me that he had to get the house finished and he
had to work along with Vavra, and it was all
right for me to go ahead and make the payments
to Vavra as well as paying for the materials.
So I did."

Vavra confirmed that he presented Mosner a bill that
included labor, that he told Sullivan to call Mosner and
that he told Sullivan if he did not get the money he

would walk off the job. Vavra further stated that he returned to Mosner's office later in the day and received the money. Sullivan denied the conversation. The chancellor said:

> "In answering that, which this Court feels to be the main issue of this case, the Court finds itself in a position of having to believe or disbelieve opposite testimony, that of the Trustee, Mr. Mosner, and that of the Complainant, Mr. Sullivan."

The chancellor made a finding of fact that the conversation took place, saying:

> "Now, Mr. Sullivan takes the stand and says never was there any conversation about this in any respect and completely denies any knowledge of it whatsoever. Because of other inconsistencies, as the Court sees it, in Mr. Sullivan's testimony, and because of no inconsistencies in Mr. Mosner's testimony, this Court finds as a matter of fact that Mr. Mosner received authority from Mr. Sullivan before any and all payments were made to Mr. Vavra."

Instances have been known in which contractors have not moved in the performance of their duties with the dispatch desired by those who employed them, a vice not confined to contractors. Vavra fitted into that category. The house was not completed within the 45 days specified in the contract. He ultimately was discharged by the Sullivans.

It is conceded that the trustees have but a few hundred dollars remaining in their hands. Disbursements to Vavra as related in a letter from Mosner to counsel for the Sullivans would appear to total $7,133.61, although the Sullivans state in their brief that the amount paid Vavra is $5,648.61. Be that as it may, some of the disbursements to Vavra were for materials and some for

labor. In a letter to the Sullivans' counsel after Vavra was discharged, Mosner stated:

> "Many of the payments listed above are not the total bill, but are less ten per cent; and the amount of this retainage which I hold—exclusive of that due Vavra—totals $386.48. This means that there is only $198.38 in the trustee account for other claims.
>
> "In addition to the Notices of Intent recited in your letter, I have received one from Southern Concrete Co., Box 303, Leonardtown, Maryland, in the amount of $90.13. We have not paid the parties who have filed Notices, and I cannot state whether Vavra acknowledged that the materials were actually furnished; however, Mr. Sullivan would have first hand knowledge of this himself."

It is the position of the Sullivans that no money was to be paid Vavra until construction was completed and that the Trustees were to disburse all money to the owners who in turn would pay the subcontractors and pay for supplies as work progressed.

The chancellor saw the case as coming down to two issues, (1) "whether or not under clause D and clause E of this construction contract the Trustees violated their duties because of having no inspections as contended by the [Sullivans], appointing no one to make inspections, or, if the Trustees are to be believed, because of allowing Mr. Sullivan, who had no experience to be the person to do the inspecting, before payments of money," and (2) "whether or not the payments as made by the Trustees, particularly those made directly to Mr. Vavra, were made without authority by the Trustees, without the knowledge of Mr. Sullivan, or without approval of Mr. Sullivan to make said payments."

The Sullivans contend to us that there are three issues, (1) that the "trustees did not carry out the terms and conditions of the trust agreement and did not utilize

the skill, diligence, and loyalty required of attorneys serving as trustees;" (2) that "the court below improperly admitted certain verbal testimony in evidence over objections," referring to testimony relative to Sullivan's direction that Vavra be paid contrary to the terms of the trust agreement; and (3) that the chancellor "erred in holding that wife was estopped from her claim that husband was not her agent."

We see the matter as coming down to five issues, each of which we shall discuss separately: the proper interpretation of the trust agreement, the inspection by Sullivan, the parol evidence issue with reference to the change in the trust agreement, the chancellor's finding relative to agency, and the exculpatory clause.

The chancellor said with reference to interpretation of the trust agreement:

> "I will first refer to the trust agreement . . . that was made between the parties on November 8, 1968. There is in this trust agreement a paragraph D . . . which reads: 'Following inspection and approval by such person or persons as may be designated by the Trustee from time to time, the Trustee shall pay to the owner, except as hereinabove otherwise provided, the installments due in accordance with the following schedule of payments:' Right after that is subparagraph E.

> "The Complainants have urged upon the Court that subparagraph D is the controlling section of this trust agreement as to the installment payments, in particular, because subparagraph D says the Trustee shall pay to the owner. The Court cannot agree with the Complainants' interpretation because clause D . . . is absolutely incomplete if it were to stop at the end of that paragraph because it says: 'The installments due in accordance with the following schedule of payments:' After that is paragraph

E on the same page. If the parties had intended paragraph D to be controlling there would have been no reason to put in paragraph E and paragraph D would have been incomplete. The testimony of all the parties indicates that this entire transaction was done in a hurry. It was done, I would say, faster than the normal operation between parties in trying to obtain a satisfactory end result that they all hoped would be accomplished. However, they all agree this paragraph E was, in fact, placed into the trust agreement prior to the signing by all parties at the actual time of settlement on November 8, 1968. At that date of settlement, also, the construction contract was entered into and signed and the various deeds and mortgages.

"Now, if you were to read the construction contract you find in the construction contract, which is Agreed Exhibit No. 3, on the first page, starting under numeral three: 'The owner shall pay the contractor for the performance of the contract the sum of $12,250 as follows:' Then A, B, and C follow the same type of language as is in the trust agreement under (E), 1, 2, and 3. This makes it completely clear to the Court that this was to be controlling.

"Now, what actually should be done under 1, 2, and 3? Under 1, 2, and 3, by the language of it, it is completely clear it was not necessary for the Trustees to make the payments directly to the owner, as it is urged upon the Court. In fact, the testimony of the owner, although he had urged the Court that it should have been done that way, from exhibits and various things filed in the case shows, even on the part of the owner, that this was never contemplated, that the money be sent directly to the owner to be paid to the various individuals. There are pieces of evidence in the case where the owner has ac-

tually written to the Trustee, Mr. Mosner, an authority to pay which would have been paid directly by Mr. Mosner. Therefore his testimony that paragraph D should be followed, that is to be paid to the owner, rather than paragraph E is without any merit whatsoever."

We think Judge MacDaniel correctly interpreted the contract.

On the issue of inspection we quote a portion of the record of direct examination of Mosner:

"Q. Subparagraph D of item first of your trust agreement says: 'Following inspection and approval by such person or persons as may be designated by the trustee from time to time . . .' just dealing with that clause, was there a discussion as to who would be designated by the trustees to inspect and approve?

"A. I doubt that there was in those exact words, Mr. Bowers. Really this paragraph probably does not belong in this particular agreement. This is a standard form. Normally when we make a construction loan we do have someone designated to inspect and we charge inspection fees of the borrower. He has got to pay inspection fees to go for inspectors to go whereever the place may be, Anne Arundel County, Ocean City, wherever it may be. In this case no inspection fees were charged because Mr. Sullivan was going to let us know when it was all right to make payments.

"Q. How did you know he was going to let you know?

"A. We told him and he agreed he would be down there on the job and he would do it.

"Q. Did you consider that satisfactory?

"A. It was satisfactory to us. He was the man to live in the house and we felt if he was satisfied with the house and authorized us to pay, we

felt that was the best protection we could get as far as the right job being done."

Relative to Sullivan the chancellor said:

"Mr. Sullivan tells the Court that he has no knowledge, does not know anything about construction, he is more or less a lamb led to the slaughter because of his lack of background, understanding, or knowledge of the building business. Introduced into the case were numerous notes left by Mr. Sullivan to Mr. Vavra which, when read, show the Court that Mr. Sullivan was a lot more knowledgeable than he would have the Court believe. The type of things that are said in those various exhibits in reference to storm doors, electrical meter, fireplace, electrical outlets, cabinets, drawings as to how cabinets should be, and other information as to vapor barriers, other types of things that were in these various papers left for the builder, the fact that Mr. Sullivan was there on the job constantly, led this Court to believe that Mr. Sullivan's appearance in the Court of his complete lack of knowledge is not correct, and that he had a lot more knowledge than he would have the Court believe.

\* \* \*

"[T]he Court finds as a matter of fact, although denied by Mr. Sullivan, the testimony convinces the Court that Mr. Mosner did discuss with Mr. Sullivan the need for Mr. Sullivan— and notify him—to inspect the property, and that Mr. Sullivan was aware and knew he was supposed to do so and, in fact, did so and, in fact, was qualified to do so."

There was evidence from which the chancellor could find as he did find. Accordingly, this finding will not be set aside. Maryland Rule 886.

The Sullivans invoke the parol evidence rule in their

effort to bar testimony relative to Sullivan's direction to Mosner to pay in a manner not specified in the agreement. They misconstrue the rule. A written agreement may be modified by a subsequent oral agreement, but the oral modification must be established by a preponderance of the evidence. *Chesapeake, etc. v. Manitowoc,* 232 Md. 555, 566, 194 A. 2d 624 (1963); *Cole, Adm'x v. Wilbanks,* 226 Md. 34, 38, 171 A. 2d 711 (1961); and *Coates v. Sangston,* 5 Md. 121, 131 (1853). The textwriters are in agreement, *see* 6 Williston, *Contracts* § 1828 (rev. ed. 1938); Simpson, *Contracts* § 98 at 196 (2d ed. 1965); 3 Corbin, *Contracts* § 574 (1960); and Restatement, *Contracts* § 407 (1932).

There clearly was evidence from which the chancellor could conclude that Sullivan agreed to the manner of payment of Vavra. This would discharge any claim that Mr. Sullivan might have against the trustees.

The problem with reference to Mrs. Sullivan is not quite so simple. The chancellor said:

> "Another issue which was raised in this case was the fact that Mary Sullivan—and Mr. and Mrs. Sullivan made this emphatic—that Mr. Sullivan never acted as her agent, she gave no one authority to do anything on her behalf. This Court finds this incredible to believe. Maybe she didn't come out and write something and say: I hereby authorize Timothy Sullivan, but by her actions—and this is her husband—and she is in Pittsburgh and he is down here and everything that transpired in this case she is estopped from alleging anything of that nature to come back against the Trustees because all indications were Mr. Timothy Sullivan was at all times acting for his and his wife's benefit. The Court, of course, feels that is improper argument on behalf of the Complainants and has no force and effect."

The Court said in *House v. Jerosimich,* 246 Md. 747,

749, 230 A. 2d 282 (1967), that in determining whether a wife was the agent of her husband the ordinary rules of agency apply. The rule would be no different in the reverse.

Restatement (Second), *Agency* (1958), says on this subject:

> "§ 22. Husband and Wife as Principal and Agent
>
> A husband or wife can be authorized to act for the other party to the marital relation.
> "Comment:
> *a.* * * *
>
> *b.* Neither husband nor wife by virtue of the relation has power to act as agent for the other. The relation is of such a nature, however, that circumstances which in the case of strangers would not indicate the creation of authority or apparent authority may indicate it in the case of husband or wife. Thus, a husband habitually permitted by his wife to attend to some of her business matters may be found to have authority to transact all her business affairs. Likewise, if a wife is customarily permitted by her husband to order household supplies, authority or apparent authority on her part to purchase things needed in the household can be readily inferred. However, the fact that married women in the community customarily do this is not alone a basis for creating authority or apparent authority."

*Powers v. Malach,* 199 Md. 110, 85 A. 2d 478 (1952), involved a suit for electrical wiring done in two apartment houses owned by husband and wife as tenants by the entireties. The husband testified that for at least 20 years he had built on properties owned by him and his wife as tenants by the entireties and that in selling his wife had joined in the deed. She did not sign that

particular contract. In holding that collection could not be effected from her, Judge Markell said for the Court:

"Too often and too recently this court has held that the relationship of husband and wife, with knowledge by her of his intention to make improvements on her property and failure on her part to object, does not make him her agent in making the improvements and does not amount to a holding out which creates an agency by estoppel. *Twilley v. Bromley,* 192 Md. 465, 470-472, 64 A. 2d 553; *Blenard v. Blenard,* 185 Md. 548, 558, 45 A. 2d 335; *Adkins & Douglas Co. v. Webb,* 160 Md. 571, 577, 154 A. 259; *Kvedera v. Mondravitzky,* 145 Md. 260, 263, 125 A. 591. Emancipation of the wife from the husband's common law dominion might be appreciably undone if he, as such, were made her general agent." *Id.* at 113.

*Cf. Parker v. Morgan,* 170 Md. 7, 26, 183 A. 224 (1936), where a husband and wife owning property as tenants by the entireties made a contract for the erection of a house in which the husband was named as architect and the Court held the wife bound by his acts in passing upon the work under the contract.

In point is the case of *Adkins & Douglas Co. v. Webb,* 160 Md. 571, 154 A. 259 (1931). There Dr. Webb built a home on the lot owned by his wife in the small town of Preston in Caroline County which had a 1950 population of 353 and had no more in 1921 when the home was erected. The parties resided about a quarter of a mile from the site. The question presented to the Court was whether the husband was the wife's agent so as to avoid the notice of intent to file a mechanics' lien required under what was at the time of the erection Code (1912) §§ 10 and 11 and is now Code (1957) §§ 10 and 11. Judge W. Mitchell Digges said for the Court:

"It is firmly established that the existence of the relationship of husband and wife, standing

494

alone, is not sufficient to create agency on the part of the husband in respect to the wife's property. 20 *Amer. & Eng. Encyc.* 327; *Abrams v. Eckenrode,* 136 Md. 244, 110 A. 468; *Hartman v. Thompson,* 104 Md. [389,] 408, 65 A. 117; 13 *R. C. L.* 1168. And knowledge by the wife of the husband's intention to construct a building on her land, together with her failure to interpose objection, are not sufficient circumstances to constitute agency. *Kvedera v. Mondravitzky,* 145 Md. 260, 125 A. 591, 593; 13 *R. C. L.* 1172." *Id.* at 577.

In that instance it was held that it was not established that the husband was the wife's agent.

There was introduced into evidence a copy of a memorandum from Sullivan to Vavra relative to six things Sullivan's "wife wanted [him] to check on." His declarations of agency would be insufficient to establish agency. *Whittle v. Brown,* 217 Md. 161, 167, 141 A. 2d 917 (1958); *Posko v. Climatic Control Corp.,* 198 Md. 578, 583, 84 A. 2d 906 (1951), and cases there cited. This is not to be confused, however, as was pointed out in *Posko,* with the testimony of the agent, since express authority may be shown through such testimony. *Strawn v. Jones,* 264 Md. 95, 99, 285 A. 2d 659 (1972). In our case Sullivan denied that he was his wife's agent, notwithstanding the memorandum which was introduced.

We conclude that the chancellor erred in determining that it was shown in this instance that Mr. Sullivan was his wife's agent, nor do we find any basis for application of the doctrine of estoppel. This brings us, therefore, to the effect and meaning of the exculpatory clause inserted as paragraph fifth in the trust agreement. The Sullivans argue that this clause "connotes no remedy for breach of duty, and is against public policy, and therefore of no force and effect." Such a view is at variance with that expressed in Restatement (Second), *Trusts* § 222 (1959); 3 Scott *Trusts* § 222 (3d ed., 1967); Bogert,

*Trusts* § 542 (2d ed. 1960) ; 54 Am. Jur. *Trusts* § 301 (1945) ; and 90 C.J.S. *Trusts* § 253b (1955). Accordingly, we shall give no more consideration to that point.

The Restatement states:

"§ 222. Exculpatory Provisions

(1) Except as stated in Subsections (2) and (3), the trustee, by provisions in the terms of the trust, can be relieved of liability for breach of trust.

(2) A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary, or of liability for any profit which the trustee has derived from a breach of trust.

(3) To the extent to which a provision relieving the trustee of liability for breaches of trust is inserted in the trust instrument as the result of an abuse by the trustee of a fidiciary or confidential relationship to the settlor, such provision is ineffective."

There was no evidence here that the provision was placed in the instrument "as the result of an abuse by the trustee of a fidiciary or confidential relationship to the settlor." The Sullivans did attempt to make an issue that nobody told them it was there. They read the instrument, however, and made no protest as to its contents. They are presumed to have understood that which they read, *Merit Music Service, Inc. v. Sonneborn*, 245 Md. 213, 221-22, 225 A. 2d 470 (1965), and cases there cited.

On the issue of public policy, comment b of § 222 of the Restatement states with reference to subsection (2) :

"Comment on Subsection (2) :

*b. Extent to which exculpatory provisions against public policy*. Notwithstanding any provision in the terms of the trust relieving the

trustee from liability for breach of trust, he is liable for breaches of trust committed in bad faith, and for intentional breaches of trust, and for breaches of trust committed with reckless indifference to the interest of the beneficiary. No provision in the terms of the trust is effective to relieve the trustee who derives a profit from a breach of trust from liability to the extent of the profit. Such provisions as these are invalid on the ground that it would be contrary to public policy to give effect to them."

On the validity of exculpatory clauses *see* Annot., 83 A.L.R. 616 (1933), and 158 A.L.R. 276 (1945).

In the light of the Restatement we shall interpret this clause as protecting the trustees against any liability in excess of the sum from time to time in hand except for such liability which may result from an act "committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary," or for any profit which the trustees have derived from a breach of trust. No profit has accrued in this instance to the trustees from any breach of the trust here so we pass to a consideration of what acts may be construed as coming within the purview of the remaining language of § 222 (2).

The liability of trustees is discussed in *Bogert, op. cit.* § 814 at 271-276, and 4 Pomeroy, *Equity Jurisprudence* § 1070 at 194 (5th ed. Symons 1941).

*Contee v. Dawson,* 2 Bland 264 (1829), concerned the will of Ann Russell, "a resident of London and a subject of the British monarch, having a large estate and many descendants, some of whom were natives and residents of England, and others residents and citizens of the United States." She made her will in 1796. A sum was left in trust to be invested "in the public stocks or funds, or at interest upon parliamentary, government, or real securities." The will provided:

"[T]he trustees, shall not be answerable or ac-

countable for any misfortune, loss, or damage whatever, that may happen to the said trust moneys, or premises, or any part or parts thereof, unless the same shall happen by or through their or his gross and wilful neglect or default respectively." *Id.* at 289.

In 1817 one of the beneficiaries, purporting to be acting also for a daughter who was of age and for certain minor children who were beneficiaries, requested the trustee to transfer investments to the United States. Loss ensued. The chancellor said:

"The trustees were allowed a very limited range of discretion as to the species of investment in England, and no where else. And it manifestly appears to have been the intention of the testatrix, that when the investment had once been made it should remain, without exposing the legacy to any new risk by any change whatever: or if any unforseen circumstance should render a new investment necessary, that it should be made in some one or other of the specified English securities; and certainly not in any foreign funds, stocks, or securities whatever. *Hancom v. Allen, 2 Dick.* 498; *Howe v. Earl of Dartmouth, 7 Ves.* 137; *Hill v. Simpson, 7 Ves.* 152; *Holland v. Hughes, 16 Ves.* 113; *Ram. on Assets,* 517.

"Hence, I feel perfectly satisfied, that the sale made by the surviving trustee William Dawson, of the stocks in which this legacy had been invested, and the transfer of the proceeds from England to Maryland was a most palpable and gross violation of the trust reposed in him; and that he must be held strictly accountable for all the consequences thereof; unless he, or at this time, his executrix, can show that he was induced to make the sale and transfer by the *cestuis que trust,* who were then competent to

recommend and to sanction the transaction."
*Id.* at 289-90.

Insight into what might be regarded as a willful default is derived from *Thompson v. Hays,* 11 F. 2d 244 (8th Cir. 1926). A trust instrument there provided that trustees each were to be liable only for his "own willful default." The court asked the question as to what was a willful default and answered the question by stating:

> "It means more than involuntary, inadvertent, negligent, mistaken, careless, or accidental default. It means an intentional designing failure to do or not to do something required—an affirmative wrong. *Van Sielen v. Bartol et al.* (C.C.) 95 F. 793; *In re Mallon's Estate,* 89 N.Y.S. 554, 43 Misc. Rep. 569; *Winslow Warren and Others, Trustees, v. Elizabeth B. Pazolt and Others,* 89 N. E. 381, 203 Mass. 328.
>
> \* \* \*
>
> "It is doubtless true that a trustee may be guilty of such wanton or willful neglect of his duties, such reckless indifference to and disregard of the interests and rights of the beneficiary, that the law will hold him guilty of a 'willful default.' *Henry L. Doherty & Co. v. Rice et al.* (C.C.) 186 F. 204; *Kessler & Co. et al. v. Ensley Co. et al.* (C.C.) 129 F. 397." *Id.* at 248.

In *Warren v. Pazolt,* 203 Mass. 328, 89 N. E. 381 (1909), cited in *Thompson,* there was an attempt to hold liable trustees where the will provided that they should be liable only for "willful defaults" and that they should not "be answerable for any loss or damage which [might] happen to the trust property without their respective willful neglect or default." The court said:

> "Wilful default means intentionally making away with the trust property and a wilful neglect means such reckless indifference to true

interests of the trust as to amount to or partake of a wilful violation of duty. The difference between neglect of duty by a trustee and a wilful neglect or default by a trustee is not unlike the difference between the liability of one who is bound to exercise due care and the liability of the owner of land to a trespasser, as to which see *Aiken v. Holyoke Street Railway,* 184 Mass. 269; *Bjornquist v. Boston & Albany Railroad,* 185 Mass. 130; *Albert v. Boston Elevated Railway,* 185 Mass. 210; *Banks v. Braman,* 188 Mass. 367; *Massell v. Boston Elevated Railway,* 191 Mass. 491; *Fitzmaurice v. New York, New Haven, & Hartford Railroad,* 192 Mass. 159, 162; *Lanci v. Boston Elevated Railway,* 197 Mass. 32, 35." *Id.* at 347.

The cases cited by the Massachusetts court set forth a rule similar to the one prevailing in Maryland which is that the owner of land owes no duty to a trespasser or a licensee, even one of tender years, except to abstain from willful or wanton misconduct and entrapment. See the long line of Maryland cases to that effect, many of which were cited in *Hicks v. Hitaffer,* 256 Md. 659, 669, 261 A. 2d 769 (1970).

In this case the court addressed a question to Mr. Mosner, "[W]hen you were dealing with Mr. Sullivan, knowing he was the husband of Mrs. Sullivan, didn't you deal with him as her agent, expecting him to make the decisions for both of them?" Mosner replied, "Yes, that is exactly what I did." He admitted that he had no written authorization of agency from wife to husband. He had earlier testified on cross-examination by counsel for the Sullivans that he thought one of the reasons the arrangement was set up for payment as it was was the fact that they "couldn't send checks up to her in Pittsburgh for signature." Mosner well knew the hurry of the parties to get into their home before Christmas. The property being improved was owned as tenants by the

entireties. The situation here was one which led the chancellor, mistakenly, to conclude that the husband was the agent of the wife. Considering the circumstances and the authorities, we conclude that the acts of the trustees here were not "committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiar[ies]." Therefore, the exculpatory clause operates as a bar to the claim against the trustees.

*Decree affirmed, appellants to
pay the costs.*